MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:    2020 ME 120
Docket:      Oxf-19-426
Argued:      July 15, 2020
Decided:     October 13, 2020

Panel:       MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

# STATE OF MAINE

v.

# PHILIP FLEMING

JABAR, J.

[¶1]  Philip Fleming appeals from a judgment of conviction of trafficking in prison contraband (Class C), 17-A M.R.S. § 757(1)(B) (2020), unlawful possession of a scheduled drug (Class D), 17-A M.R.S. § 1107-A(1)(C) (2020), and violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A) (2020), entered by the trial court (Oxford County, *Stokes, J.*) following a jury trial.[1]  For the reasons that follow, we vacate the judgments of conviction and remand the matter to the trial court for further proceedings.

---

[1]  The jury found Fleming guilty of Count 1 (trafficking in prison contraband) and Count 3 (unlawful possession of a scheduled drug).  Fleming waived his right to a jury trial for Count 4 (violating a condition of release), which was simultaneously tried to the court.  Count 2 (domestic violence assault) was dismissed prior to trial.

## I. BACKGROUND

### A.    Factual Background

[¶2]  Viewing the evidence in the light most favorable to the verdict, the jury rationally could have found the following facts beyond a reasonable doubt. *See State v. Ouellette*, 2019 ME 75, ¶ 11, 208 A.3d 399.

[¶3]  On March 6, 2019, Philip Fleming, who identifies as a Black man, was arrested for domestic violence assault (Class D),[2] 17-A M.R.S. § 207-A(1)(A) (2020).  He was placed in handcuffs and transported to the Oxford County Jail. Upon his arrival, a corrections officer (C.O.) conducting Fleming's intake opened the rear door of the cruiser and asked Fleming the "standard three questions" that he asks individuals brought into the jail: (1) whether Fleming was suicidal, (2) whether Fleming had any drugs or weapons on him or inside of him, and (3) whether Fleming had received medical treatment in the past 48 hours.  With regard to the second question, Fleming answered that to his knowledge he did not have any drugs or weapons on or inside him, and that he "ha[d] already been patted down."  The C.O. warned Fleming that it would be a Class C offense to bring any contraband into the jail with him; this warning also

---

[2]  This arrest for domestic-violence assault initiated the sequence of events underlying the remaining charges on the indictment.  Although originally included as Count 2 of the indictment, this charge was dismissed prior to trial.

appeared on a sign posted at the entry to the jail. Fleming did not respond to the C.O.'s warning.

[¶4] Fleming was then brought into the booking room where his handcuffs were removed and a pat down search was performed. At that time, the arresting officer informed the C.O. that Fleming was going to be charged "with drug paraphernalia." In light of this information, the C.O. brought Fleming into a holding cell to conduct a strip search. When Fleming removed his undergarments the C.O. "noticed that there was a plastic bag wrapped around [Fleming's] penis."[3] At that point, Fleming and the C.O. "both kind of looked at each other and then [Fleming] look[ed] down and said, ['T]hat's not mine, I don't know how that got there.[']" The C.O. did not ask Fleming anything about the plastic bag before Fleming volunteered that the bag did not belong to him. Following Fleming's statement, however, the C.O. asked "whose it may be." Fleming told the officer that it belonged to the girl and that "she [was] trying to set me up." The C.O. testified that the contents of the bag appeared to be "crack."[4] The C.O. never informed Fleming of his *Miranda* rights and, to the C.O.'s knowledge, Fleming was not otherwise informed of his *Miranda* rights.

---

[3] It was undisputed that the plastic bag must have been wrapped around Fleming's penis *prior* to his arrest.

[4] Testing subsequently confirmed that the substance was cocaine base.

4

B.     Procedural History

[¶5]  A four-count indictment was filed against Fleming, charging him with (1) trafficking in prison contraband (Class C), 17-A M.R.S. § 757(1)(B); (2) domestic violence assault (Class D), 17-A M.R.S. § 207-A(1)(A); (3) unlawful possession of a scheduled drug (Class D), 17-A M.R.S. § 1107-A(1)(C); and (4) violating a condition of release (Class E), 15 M.R.S. § 1092(1)(A).[5]

1.     Jury Selection

[¶6]  Jury selection took place on July 8, 2019.  Fleming requested eleven race-related voir dire questions that would explore the potential jurors' beliefs and experiences—both positive and negative—with regard to African Americans.[6]  In addition to identifying racial bias, defense counsel proffered as a reason for asking the questions, "I suspect that we'd be lucky if a fraction of [jurors] have had or currently have African American friends, family or

---

[5]  Fleming was originally charged by criminal complaint with Count 1, trafficking in prison contraband (Class C), and Count 2, domestic violence assault (Class D), on March 6, 2019; he pleaded not guilty to both.  According to the docket record, he never entered a plea on Counts 3 and 4.

[6]  The questions were: (1) Do you have or have you ever had any African American relatives? (2) Do you have or have you ever had any African American friends? (3) Do you have or have you ever had any African American co-workers? (4) Do you have or have you ever had any African American acquaintances? (5) Have you ever had any negative experiences with an African America[n]? (6) Have you ever had a bad experience with an African America[n]? (7) Have you ever had a good experience with an African America[n]? (8) Do you have any negative opinions or beliefs about African Americans? (9) Do you believe that African Americans are less truthful and honest than white Americans? (10) Do you believe that African Americans are more likely than white Americans to commit crimes? (11) The defendant in this case is an African American.  For any reason, will it be difficult for you to fairly and impartially decide this case?

acquaintances. So I think it's fair that the defendant have knowledge of who those people . . . are, so that he . . . can rationally exercise his peremptory challenges."

[¶7] The court rejected Fleming's proposed questionnaire but had the prospective jurors complete a questionnaire that required them to answer "yes" or "no" to the following four questions:

1. Would you find it difficult to be fair, impartial and objective if the witnesses, victim and/or defendant are of a different race or ethnicity than you?
2. Based on your life experiences, would you decide the credibility of a witness or actions of a person differently because of that person's race or ethnicity?
3. Have you had any adverse problems or confrontations with a person of a different ethnicity?
4. If you answered "Yes" to any of the above questions, will it be difficult for you to decide this case fairly, impartially and objectively?

Before the distribution of the juror questionnaires, the court instructed the jury pool on the importance of basing any decision on the evidence in the case, and not on any "preconceived belief" or "preconceived prejudices" they might have. Jurors who answered "yes" to questions 1, 2, or 4 were automatically removed from the jury pool.[7] The jurors who responded "yes" to question 3 but "no" to

---

[7] As Fleming notes in his brief, the jury selection transcript is not entirely clear as to the removal of jurors based on their answers to these questions. However, it appears that only the jurors who answered that they could be impartial remained in the jury pool at this point.

6

question 4 underwent additional voir dire. As a result of this process, one additional juror was stricken for cause.

### 2. Motion to Suppress

[¶8]  Fleming filed a motion to suppress seeking to suppress the statements he made to the C.O., and a suppression hearing was held on the morning of trial. The court granted Fleming's motion to suppress with regard to the statement he made in response to the C.O.'s question of whether Fleming had any drugs or weapons on him. The court denied Fleming's motion as it pertained to the exchange that took place during Fleming's strip search. It found that Fleming's statement during the strip search, "It is not mine, I don't know how it got there," was a spontaneous volunteered statement and the C.O.'s follow-up question was designed to clarify that ambiguous statement.

### 3. Trial

[¶9]  A one-day jury trial was held on July 11, 2019. At trial, the parties argued over the court's instructions on the issue of the culpable mental state required by 17-A M.R.S. § 757(1)(B) and how the parties could address this issue in their arguments. Fleming argued that the State should be prohibited from arguing that his intent to possess prison contraband could be inferred from his failure, despite warnings, to disclose to the officers that he had

something wrapped around his penis. Over Fleming's objection, the court opined that the warning was relevant to Fleming's culpable mental state and allowed the State to argue that point.[8] Indeed, in her closing argument the prosecutor argued that Fleming's intent to possess prison contraband could be inferred from both his failure to disclose his possession in response to the warnings given to him and his explanation for the plastic bag upon its discovery.

[¶10] The jury returned guilty verdicts on Count 1, trafficking in prison contraband (Class C), and Count 3, unlawful possession of a scheduled drug (Class D). The court found Fleming guilty of Count 4, violating a condition of release (Class E).

[¶11] The court entered a judgment of conviction for Counts 1, 3, and 4, and sentenced Fleming to one year in prison for Count 1, six months in prison on Count 3, and six months in prison on Count 4, all to run concurrently. Fleming timely appeals. M.R. App. P. 2B(b)(2).

---

[8] Fleming renewed this argument in a post-trial motion for a judgment of acquittal or a new trial on Count 1, arguing that the State could not prove Fleming had the intent to possess prison contraband. The court once again rejected this argument in an order denying Fleming's post-trial motions.

## II. DISCUSSION

[¶12] Fleming raises two primary issues on appeal: (1) whether the trial court abused its discretion when it denied Fleming's requested race-related voir dire questions, and (2) whether the trial court erred in partially denying Fleming's motion to suppress. Because we are vacating the convictions and remanding the case for a new trial, we address both issues to provide guidance to the parties and the trial court.

### A. Voir Dire

[¶13] Fleming asserts that the four voir dire questions contained on the court's questionnaire were insufficient to uncover racial biases among potential jurors. Recognizing that our earlier decisions may not have provided sufficient guidance in this area, we hold today that the questionnaire used by the trial court was insufficient. In order to allow the parties and the court to ensure that jurors chosen to sit in judgment will base their decisions on evidence rather than bias or prejudice, we must task the trial courts with doing more.

[¶14] In a recent decision addressing this issue, we noted that "the purpose of the voir dire process is to detect bias and prejudice in prospective jurors, thus ensuring that a defendant will be tried by as fair and impartial a

jury as possible." *State v. Roby*, 2017 ME 207, ¶ 11, 171 A.3d 1157 (quotation marks omitted). We have also held that a "trial court is not required to conduct voir dire precisely in the manner requested by a defendant so long as the voir dire process is sufficient to disclose facts that would reveal juror bias." *State v. Bethea*, 2019 ME 169, ¶ 16, 221 A.3d 563 (quotation marks omitted). Although neither holding is incorrect, neither has provided the trial courts with sufficient guidance. We attempt to address that lack of guidance today.

1. *Turner* and *Bethea*

[¶15]  Thirty-five years ago, in *State v. Turner*, we explained that "the United States Supreme Court has noted that 'there is no constitutional presumption of juror bias for or against members of any particular racial or ethnic group. . . . [O]nly when there are more substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors . . . does the trial court's denial of a defendant's request to examine the juror's ability to deal impartially with this subject amount to an unconstitutional abuse of discretion.'" 495 A.2d 1211, 1212 (Me. 1985) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981)). Although the defendant in *Turner* was a Black woman charged with prostitution, we stated that the case was "free of any racial overtones," and noted with approval that the trial court asked the prospective

jurors "whether anything about the defendant's race would make it difficult for [them] to serve impartially." *Id.* at 1212, 1213. No jurors said it would and, concluding "[t]here was no reason to suspect that the members of the panel had not responded truthfully," we held that "voir dire was sufficient to expose juror prejudice based on the defendant's race." *Id.* at 1213.

[¶16] For the first time in the thirty-five years since *Turner* was decided, we were presented with the issue of whether a voir dire process was sufficient to identify racial bias in *State v. Bethea*, 2019 ME 169, 221 A.3d 563. Bethea argued that he was denied his constitutional right to a fair trial when the trial court did not include his proposed race-related questions in the juror questionnaire. *Id.* ¶ 15. Explaining that there was significant overlap between the five questions designed to uncover racial bias that were included on the questionnaire and Bethea's proposed questions, we held that "[t]he court did not abuse its discretion in declining to word its questions precisely as Bethea requested." *Id.* ¶¶ 17-18. The trial court in *Bethea* added a voir dire question in response to Bethea's request for additional inquiry on racial prejudice, asking whether the potential jurors had "any negative views" or "any negative experiences" with people who are African American or Black. *Id.* ¶¶ 9, 17. We held that by "includ[ing] five questions related to race on the questionnaire,

incorporating some of Bethea's suggestions; excus[ing] any juror whose answers to those questions suggested any racial bias; and permitt[ing] Bethea to ask follow-up questions to potential jurors during individual voir dire," the trial court had "thoroughly probed the issue of racial bias and acted within its discretion in its conduct of voir dire." *Id.* ¶ 19.

[¶17]  The trial court in this case did not have the guidance from our decision in *Bethea*—issued in December 2019—when Fleming's jury selection took place in July 2019.  In addition, in our affirmance of the *Bethea* trial court's actions, we may have failed to state with any real clarity that we were adopting a standard stricter than that applied in *Turner*.  To clear up any lingering questions, we do so now.  Whenever a trial includes "racial issues," *Turner,* 496 A.2d at 1213, trial courts are required to thoroughly probe the issue of racial bias.[9]

---

[9]  Under the primacy approach applied by this Court, *see State v. Chan*, 2020 ME 91, ¶ 34, --- A.3d --- (Connors, J., concurring), we first look to the Maine Constitution, with federal precedent serving as potentially persuasive but not dispositive guidance with respect to constitutional provisions with similar goals.  To the extent that the federal counterparts to Maine's requirement of an impartial jury, found in art. I, § 6 of the Maine Constitution, are deemed not to impose the inquiry we mandate today, *see Rosales-Lopez v. United States*, 451 U.S. 182, 192 (1981), we conclude that the Maine Constitution demands more.  *See Bennett v. State*, 161 Me. 489, 495-96, 214 A.2d 667 (1965) (noting "the great importance we attach to the constitutional entitlement of a party accused of crime to an impartial jury trial").

12

## 2. Racial Bias in Voir Dire

[¶18]  Today's practical reality is that "[m]any years of research focusing on the judicial system demonstrates that, at nearly every point, from school discipline to death sentences, results are unduly skewed along lines of race, ethnicity, or other group identity."  Am. Bar Ass'n, *Achieving an Impartial Jury (AIJ) Toolbox* 1, https://www.americanbar.org/content/dam/aba/publications /criminaljustice/voirdire_toolchest.pdf (footnotes omitted).

[¶19]  Here in Maine, the U.S. Census Bureau estimates that 94.4% of the population identifies as White, while just 1.7% of Mainers identify as Black or African American. U.S. Census Bureau, *Quick Facts: Maine* (July 1, 2019), https://www.census.gov/quickfacts/fact/table/ME/PST045219.       These demographics will often lead to a jury with a racial makeup that a prosecutor is forbidden from purposely seeking under *Batson v. Kentucky*, 476 U.S. 79 (1986).[10]

[¶20]  Questioning potential jurors about their *explicit* views, opinions, or beliefs about people of a different race is a critical step in achieving the

---

[10] As Fleming observed, oftentimes it will simply not be possible to include Black jurors on a Black defendant's jury given the overwhelmingly White racial makeup of the state.  This is especially true of certain counties in Maine, such as Oxford County, where less than one percent of the population identifies as Black or African American.  *See* U.S. Census Bureau, *Quick Facts: Oxford County, Maine* (July 1, 2019), https://www.census.gov/quickfacts/fact/table/oxfordcountymaine/ PST045219.

ultimate goal of the voir dire process: detecting bias and prejudice in prospective jurors. *See Roby*, 2017 ME 207, ¶ 11, 171 A.3d 1157. In order to uncover potential racial biases or prejudices, trial courts should inquire during voir dire whether prospective jurors have any negative opinions or beliefs about individuals or groups who share the defendant's race or ethnicity. Asking this explicit question is a necessary step toward ensuring that each defendant—regardless of race or ethnicity—is "tried by as fair and impartial a jury as possible." *Id.* (quotation marks omitted); *see* Alexander, *Maine Jury Instruction Manual* § 2-4D at 2-18 to -19 (2019-2020 ed.). In order to thoroughly probe the issue of racial bias, the trial court should then exercise its discretion in permitting follow-up questions to potential jurors during individual voir dire. *See Bethea*, 2019 ME 169, ¶ 19, 221 A.3d 563.

[¶21] Over the past decade, legal scholarship has recognized the role that implicit or unconscious racial biases and in-group favoritism play in the administration of justice. *See, e.g.*, Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 152 (2010) ("Lawyers, judges, and other legal professionals need to heighten their awareness and understanding of implicit bias, its role in our civil

14

and criminal justice system, and in particular, the problems that it creates with regard to juries."); Robert J. Smith et al., *Implicit White Favoritism in the Criminal Justice System*, 66 Ala. L. Rev. 871, 895 (2014) ("At the core of research on implicit in-group favoritism is the principle that people automatically associate the in-group, or 'us,' with positive characteristics, and the out-group, or 'them,' with negative characteristics.").[11]  As our understanding of these concepts evolves, so too must the way we confront them in our administration of justice.

[¶22]  It may be difficult to uncover and address implicit racial biases among potential jurors, but that does not lessen the importance of developing methods to confront these biases in our justice system.  We echo the other courts that have noted the importance of doing so and instruct our trial courts to be proactive about addressing implicit bias.  *See State v. Berhe*, 444 P.3d

---

[11] Various courts have also discussed the prevalence of implicit racial bias. *See, e.g.*, *State v. Plain*, 898 N.W.2d 801, 817 (Iowa 2017) ("While there is general agreement that courts should address the problem of implicit bias in the courtroom, courts have broad discretion about how to do so. . . . We strongly encourage district courts to be proactive about addressing implicit bias . . . ."); *United States v. Ray*, 803 F.3d 244, 259-60 (6th Cir. 2015) ("[W]e recognize the proven impact of implicit biases on individuals' behavior and decision-making.  Social scientists have examined extensively the theory of implicit bias in recent decades, especially as it relates to racial bias." (footnote omitted)); *see also* *State v. Collins*, No. CR-12-4755, 2013 Me. Super. LEXIS 8, *2-3 n.1 (Jan. 11, 2013) ("Many states have appointed commissions and task[] forces to look at racial bias in the criminal justice system.  Repeatedly these commissions have reached the same conclusion that racial bias affects our criminal justice system.  Bias includes unfounded stereotypes about African Americans, which we must acknowledge exist. . . . Speaking up against the conscious and *unconscious* bias that impacts our criminal justice system and our society in so many ways is the only way to eradicate it.")

1172, 1180-81 (Wash. 2019) ("[I]mplicit racial bias can affect the fairness of a trial as much as, if not more than, 'blatant' racial bias. However, implicit racial bias can be particularly difficult to identify and address. Nevertheless, as our understanding and recognition of implicit bias evolves, our procedures for addressing it must evolve as well." (citations omitted)).

3. Fleming's Jury Selection

[¶23] Unlike the questionnaire in *Bethea*, 2019 ME 169 ¶ 9, 221 A.3d 563, the questionnaire used in this case failed to incorporate Fleming's requested question of whether the potential jurors harbored "any negative opinions or beliefs" about either African Americans or Black people.[12]

[¶24] Given the lack of any questions that directly addressed Fleming's concerns about the jurors' contact with or opinions about people who are African American or Black, the voir dire process was not "sufficient to disclose facts that would reveal juror bias." *State v. Lowry*, 2003 ME 38, ¶ 11, 819 A.2d 331.

---

[12] The questionnaire in *Bethea* included the question "Do you have any negative views [of] or have you had any negative experiences with people who are African-American/black?" – a question that overlapped with Bethea's proposed questions. *State v. Bethea*, 2019 ME 169, ¶¶ 8-9, 221 A.3d 563. The questionnaire given to Fleming's jury pool asked, "Have you had any adverse problems or confrontations with a person of a different ethnicity?" It did not, however, include even a single question asking about the jurors' views or opinions of African-American or Black people.

16

B.    Motion to Suppress

[¶25]  Although we vacate the convictions and remand the case for a new trial based on the voir dire questions, we also address the suppression issue. The denial of a motion to suppress is reviewed for clear error as to factual issues and de novo as to issues of law. *State v. Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132.  Fleming contends that the court erred in denying his motion to suppress his statement, because the C.O.'s question, "whose [bag] it may be," was custodial interrogation for *Miranda* purposes.  Fleming asserts that he was prejudiced as to Count 1 by the admission of this statement at trial.[13]  There is no dispute that Fleming was in custody; the parties dispute only whether the C.O.'s question constituted "interrogation" under *Miranda v. Arizona*, 384 U.S. 436 (1966).  "[A] court's conclusion that a law enforcement officer's comment did not constitute interrogation will be upheld unless the evidence shows that a contrary inference was the only reasonable conclusion that could have been

---

[13]  Fleming concedes that the error was harmless with respect to the convictions on Counts 3 and 4.

drawn." *State v. Reese*, 2010 ME 30, ¶ 6, 991 A.2d 806 (quotation marks omitted).

1. Interrogation

[¶26] "[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980) (footnotes omitted). "[B]rief, neutral questions that are not part of an effort to elicit a confession or admission do not constitute interrogation." *Reese*, 2010 ME 30, ¶ 8, 991 A.2d 806.

[¶27] In *State v. Dominique*, 2008 ME 180, ¶ 13, 960 A.2d 1160, the defendant was arrested and brought to the police station to take an Intoxilyzer test. After the administering officer explained the procedure, the defendant stated, "It's not going to work, though." *Id*. The officer replied to the defendant's unprompted statement with "No?" *Id.* The defendant gave an incriminating response. *Id.* We held that the officer's, "No?" was at most "a follow-up question for clarification purposes" and that it could not be inferred that the officer knew or should have known that his follow-up question "was likely to elicit some kind

of incriminating response." *Id*. ¶ 14. We explained that the defendant could have made his initial statement for any number of reasons unrelated to the question of whether he was operating under the influence. *Id.*

[¶28] A number of the United States Circuit Courts of Appeal have also addressed whether follow-up questions to volunteered statements implicate *Miranda* concerns. In *Andersen v. Thieret*, 903 F.2d 526, 531-32 (7th Cir. 1990), an unwarned defendant spontaneously volunteered the statement, "I stabbed her," while he was in custody for reasons unrelated to any stabbing.[14] The Seventh Circuit held that "the police officer's responsive question, 'Who?,' did not require full *Miranda* warnings before its utterance." *Id*. at 532. The court described the officer's question as "a neutral response, intended to clarify Andersen's puzzling declaration; it was not coercive interrogation that *Miranda* seeks to prevent." *Id.*

[¶29] Recognizing that "follow-up questions can take a variety of forms," the Second Circuit has opined that "[c]areful inquiry into the underlying facts and circumstances may thus be necessary to determine whether a suspect in a

---

[14] The defendant was not in custody as a suspect for an unsolved murder as the result of a stabbing; rather, he was in custody for a disorderly conduct charge arising from an incident reported by his mother. *Andersen v. Thieret*, 903 F.2d 526, 528 (7th Cir. 1990). He made the statement five minutes into the car ride after some conversation about "the weapon that the defendant's mother said he had," which the defendant denied possessing. *Id.* After an "interval of silence" the defendant blurted out that he had "stabbed her." *Id.* At this point, the police asked, "Who?" *Id.*

particular case would have reasonably understood that the follow-up questions were seeking only to clarify information already volunteered rather than to compel further incriminatory disclosures." *United States v. Rommy*, 506 F.3d 108, 133 (2d Cir. 2007) (footnote omitted) (quotation marks omitted); *see also Tolliver v. Sheets*, 594 F.3d 900, 921 (6th Cir. 2010) ("The difference between permissible follow-up questions and impermissible interrogation clearly turns on whether the police are seeking clarification of something that the suspect has just said, or whether instead the police are seeking to expand the interview."); *United States v. Gonzales*, 121 F.3d 928, 940 (5th Cir. 1997) (holding that "when a suspect spontaneously makes a statement, officers may request clarification of ambiguous statements without running afoul of the Fifth Amendment"); *United States v. Rhodes*, 779 F.2d 1019, 1032 (4th Cir. 1985) (holding that officer's question, "Why?," in response to defendant's spontaneous statement, "You can't take that," made during the execution of a search warrant, did not amount to interrogation).[15]

---

[15] Various state courts have also addressed the issue. *See, e.g., State v. Walton*, 41 S.W.3d 75, 84-86 (Tenn. 2001) (collecting cases and holding that follow-up questions to an unmirandized defendant's voluntary statement are permissible, "unless the officer has reason to believe that the follow-up questions are 'reasonably likely to elicit an incriminating response,'" in which case "*Miranda* warnings must be given before any answers to the follow-up questions are properly admissible").

[¶30]   Whether the trial court erred in denying Fleming's motion to suppress thus turns on the nature of the C.O.'s follow-up question.   The trial court found that Fleming's volunteered statement, "It is not mine, I don't know how it got there," was an ambiguous statement and that the C.O.'s follow-up question was designed to clarify Fleming's volunteered statement.   We review these findings for clear error, *see Diana*, 2014 ME 45, ¶ 11, 89 A.3d 132, considering the circumstances present at the time the question was asked, *see Innis*, 446 U.S. at 300-02.

[¶31]   In this case, the strip search was being conducted *because* Fleming was discovered with drug paraphernalia, the C.O. knew Fleming had not received *Miranda* warnings, the C.O. had personally warned Fleming of the consequences of bringing contraband into the jail, and the C.O. believed an explanation from Fleming was warranted as to "why the plastic bag was wrapped around his penis."   In this context, the C.O. *should have known* that the follow-up question—regardless of how brief it may have been—would elicit an incriminating response from Fleming.   This is especially true given that an "incriminating response" is "any response—whether inculpatory or exculpatory—that the *prosecution* may seek to introduce at trial."   *Innis*, 446 U.S. at 301 n.5 (emphasis in original).

[¶32]  Unlike the follow-up questions in *Dominique*, 2008 ME 180, ¶ 15, 960 A.2d 1160, it is difficult to conclude that the C.O.'s follow-up question, asking "whose it may be," was merely a clarifying question.  *See also Andersen*, 903 F.2d at 531-32; *Rhodes*, 779 F.2d at 1032.  Fleming's statement stated only that the bag was not his and that he did not know how the bag got there.  The problem with that statement is not that it is ambiguous; the problem is that it seems totally implausible.  Asking who the bag may belong to seeks to expand Fleming's implausible statement, not clarify an ambiguous one.  *See Tolliver*, 594 F.3d at 921.

[¶33]  We conclude that the C.O.'s question about whose bag it may be was a custodial interrogation for *Miranda* purposes and the trial court erred in denying Fleming's motion to suppress his responding statement.

2.     Harmless Error

[¶34]  We must next consider whether the error was harmless.  *See State v. Dobbins*, 2019 ME 116, ¶ 38, 215 A.3d 769.  "Any error, defect, irregularity, or variance that does not affect substantial rights shall be disregarded."  M.R.U. Crim. P. 52(a).  "A constitutional error made at trial may be deemed harmless if we are satisfied beyond a reasonable doubt, based on the trial record as a

whole, that the error did not contribute to the verdict obtained." *State v. Larsen*, 2013 ME 38, ¶ 23, 65 A.3d 1203 (quotation marks omitted).

[¶35] A major issue disputed by the parties at trial, as well as in Fleming's post-trial motions, was whether the State could prove that Fleming "acted intentionally and voluntarily in possessing the drugs while in official custody." In the State's closing argument and its rebuttal, the prosecutor emphasized the statement Fleming made in response to the C.O.'s question. In her closing argument, the prosecutor posited:

> The State would suggest that the defendant's statements immediately after [the C.O.] observed the baggy and the substance and the drugs, that's not mine, that's my girl's, she is trying to set me up. The State would submit that the jury can infer from those statements the defendant knew he had drugs on him, *he knew he was going to the jail*, he knew he was going to get searched at the jail, and all the while he possessed these scheduled drugs.

(Emphasis added.) The prosecutor reiterated this point in her rebuttal:

> The defendant was explicitly warned by [the C.O.] that if he had drugs and he went past that point, he could be charged with a Class C trafficking, that's what happened. The defendant knew that. He heard those warnings. He arguably knew he was in possession of these scheduled drugs. The State would suggest that these are the consequences of the defendant's actions. By bypassing those warnings given to him, by attempting to pass blame of possession of those drugs, remember the first thing he said was, that's not mine, that was my girl's, she is trying to set me up. He knew he had them. He was trying to not get caught with them.

[¶36]    This seemingly innocuous statement, that the contraband belonged to his girl, who was trying to set up him, does not contain much in the way of incriminating evidence.  However, the State relied on the statement to establish Fleming's intent—positing that an inference could be drawn from the statement that Fleming "knew he was going to jail" while possessing the drugs.

[¶37]    To begin the harmless error analysis, we must examine the meaning of "intent" as the term is used in 17-A § 757(1)(B).[16]  Section 757 is a very broad statute that encompasses conduct far beyond the statute's title—"Trafficking in prison contraband."  17-A M.R.S. § 757.  "The interpretation of a statute is a legal issue we review de novo."  *State v. Jones*, 2012 ME 88, ¶ 6, 46 A.3d 1125.

---

[16] Although Fleming's decision not to raise this argument as an independent issue on appeal (e.g., by challenging the court's denial of his post-verdict motion for a judgment of acquittal or by challenging the jury instructions on the intent element) could indicate a waiver of the issue, we treat the issue as properly raised in light of its development in the context of Fleming's suppression argument, the unusual circumstances present in this case, and Fleming's preservation of this issue at trial and in his post-trial motions. *See State v. Bard*, 2018 ME 38, ¶ 36, 181 A.3d 187; *State v. Wilbur*, 278 A.2d 139, 148 (Me. 1971).

In any event, our conclusion that the court's denial of Fleming's motion to suppress was erroneous requires us to undertake a harmless error analysis. We cannot complete the analysis without first interpreting 17-A M.R.S. § 757(1)(B) to determine what intent is required under the statute. However, we do not address the argument Fleming raised below—that the trial court's interpretation of section 757(1)(B) would violate a defendant's right against self-incrimination by forcing a defendant to admit to having contraband on him when he is warned that possession beyond the point in question would be in violation of law—because Fleming did not properly raise the issue on appeal and its resolution is unnecessary to our harmless error analysis.

24

[¶38]  Section 757(1)(B) provides, "A person is guilty of trafficking in prison contraband if . . . [b]eing a person in official custody, the person intentionally makes, obtains or possesses contraband."  Scheduled drugs, including cocaine base, are considered "contraband" as that term is used in the statute.  *See id.*; 17-A M.R.S. §§ 1101-1102 (2020).  For the purposes of section 757,

> "official custody" means arrest, custody in, or on the way to or from a courthouse or a jail, police station, house of correction, or any institution or facility under the control of the Department of Corrections, or under contract with the department for the housing of persons sentenced to imprisonment, the custody of any official of the department, the custody of any institution in another jurisdiction pursuant to a [concurrent] sentence . . . or any custody pursuant to court order.

17-A M.R.S. § 755(3) (2020); *see* 17-A M.R.S. § 757(2) (2020).

[¶39]  It is clear from the plain language of section 757(1)(B) that a person's intent to make, obtain, or possess contraband must exist contemporaneously with the official custody.  Despite the statute's title, a violation may occur in the course of *any* official custody.  A defendant's possession of contraband while in official custody cannot be "intentional" for purposes for section 757(1)(B) unless the defendant intended to have the

contraband *while* in official custody. Unlike statutes in other jurisdictions,[17] Maine's statute does not create a separate offense or greater penalty for possession once the threshold to a prison is crossed—section 757(1)(B) is applicable from the moment a defendant is first placed "in official custody."[18] If we were to interpret the statute as requiring only that a defendant have an intent to possess "contraband" at some point, and that the defendant in fact ended up in custody while in possession of that contraband, defendants would be required to predict the precise moment at which they would be arrested or placed in official custody so that they could inform law enforcement of their possession of contraband prior to that moment. This is a wholly unreasonable interpretation of section 757(1)(B).

---

[17] While a number have courts have addressed this issue in the context of their states' equivalent statutes, Maine's statute has a far broader reach because it applies to any person in *official custody*— not just in confinement facilities, as provided by other states' statutes. *See State v. Fowle*, 819 S.E.2d 719, 720 (Ga. Ct. App. 2018) (statute making it illegal "to come inside the guard lines established at any state or county correctional institution" with certain items); *State v. Barnes*, 747 S.E.2d 912, 917 (N.C. Ct. App. 2013) (increased penalty for unlawful possession occurring "on the premises of a penal institution or local confinement facility"); *People v. Gastello*, 232 P.3d 650, 653 n.3 (Cal. 2010) (statute only applicable to places where inmates or prisoners are located); *Taylor v. Commonwealth*, 313 S.W.3d 563, 565 (Ky. 2010) (statute applicable to a person who "knowingly introduces . . . contraband into a detention facility or a penitentiary"); *State v. Carr*, No. M2007-01759-CCA-R3-CD, 2008 Tenn. Crim. App. LEXIS 753 (Tenn. Crim. App. Sept. 26, 2008) (statute exclusive to penal institutions).

[18] In states where a defendant has committed a new offense as soon as he crosses into a prison or jail while possessing contraband, courts seem to draw a distinction between possessing drugs outside of jail and inside jail. This is not the case under Maine's statute, because possession while in *any* official custody violates section 757(1)(B).

[¶40]   The State admitted during oral argument that, under its interpretation of the statute, it could charge someone arrested for operating under the influence with a violation of section 757(1)(B)—a felony—if that person had contraband on their person at the time of their OUI arrest. Moreover, because "contraband" is defined by section 757(2) to include certain items otherwise lawful to possess, under the prosecution's interpretation, a person who is in legal possession of an item considered contraband under section 757(2), such as a lawfully owned firearm, would automatically be in violation of the statute if placed under arrest for *any* crime—even when the arrest was unexpected.  This interpretation far exceeds the purpose and intent of the statute as expressed in the title: Trafficking in prison contraband.

[¶41]   Given the broad reach of this statute as expressed by the prosecution, it is hard to conclude that the admission of Fleming's statement was harmless.  For our construction of this statute not to be overly broad, and not to encompass mere possession at the time of one's arrest, the State would have to prove that the defendant was, at the time he initially placed the drugs on his person, aware that he was going to be placed in official custody.  It is irrelevant whether Fleming, while possessing the drugs and unable to dispose of them, learned that he was going to jail—what matters is whether Fleming

formed an intent to possess the drugs after he learned he was being taken into official custody. No evidence was presented at trial to support a theory that Fleming intended to possess the contraband *while* in official custody. In fact, it was undisputed that Fleming must have wrapped the plastic bag around himself *prior* to his arrest, and the State presented no evidence to show that Fleming anticipated being placed in official custody when he did so. The testimony at trial made it abundantly clear that Fleming could not have physically disposed of the drugs once handcuffed.

[¶42] In this case, the court should not have credited the State's argument that Fleming's answer to the follow up question was evidence of his intent because it showed that he "knew he was going to jail." We are not convinced that the error in admitting the response did not contribute to the verdict obtained. *See Larsen*, 2013 ME 38, ¶ 23, 65 A.3d 1203. The error was therefore not harmless.

## III. CONCLUSION

[¶43] We hold that the trial court erred in its handling of the voir dire process, and we vacate the judgments of conviction. Additionally, we hold that

the trial court erred in admitting Fleming's response to the C.O.'s question and that the error was not harmless.[19]

The entry is:

> Judgments vacated. Remanded for further proceedings consistent with this opinion.

---

Christopher S. Berryment, Esq. (orally), Mexico, for appellant Philip Fleming

Andrew S. Robinson, District Attorney, and Alexandra W. Winter, Asst. Dist. Atty. (orally), Office of the District Attorney, South Paris, for appellee State of Maine

Oxford County Unified Criminal Docket docket number CR-2019-30106
FOR CLERK REFERENCE ONLY

---

[19] We also take this opportunity, as we did at oral argument, to question whether a charge of trafficking in prison contraband—which requires proof that the person intentionally possesses contraband while in official custody—is appropriately used against persons who are arrested involuntarily with no indication of any intent to go into official custody (as opposed to persons reporting to serve a sentence or in response to an outstanding warrant). Here, there is no indication that Fleming knew he was going to be arrested and brought to the jail facility.