MLR/SC #203-21                                      3/29/21

STATE OF MAINE
KENNEBEC, SS.

UNIFIED CRIMINAL DOCKET
AUGUSTA
DOCKET NO. CR-20-115

STATE OF MAINE ~~ADA~~ Katie Sibley

V.

DECISION ON MOTION TO SUPPRESS

TIMOTHY BARCLIFT

Δ William Baghdoyan

## INTRODUCTION

This matter is before the court for resolution on the Defendant's (Timothy Barclft's) Motion to Suppress Evidence dated November 9, 2020. An evidentiary hearing was conducted on the motion on January 21, 2021. Post-hearing briefing was completed on February 26, 2021.

At the hearing, the court received the testimony of: MDEA Agent Nathan Walker; Det. Matthew Estes of the Augusta Police Department, and; Cpl. Derrick Record of the Maine State Police. State's Exhibits 1 - 4 were admitted without objection, and they are described as being: (1) video from Concord Trailways Bus Terminal in Augusta for January 22, 2020; (2) *Miranda* Warning and Waiver form dated January 22, 2020 at 5:20 pm; (3) video of interview at Augusta Police Department booking room on January 22, 2020, and; (4) video (without sound) from Cpl. Record's cruiser camera on January 22, 2020 depicting the stop and detention of Mr. Barclift.

Based upon the evidence presented at the hearing, the court makes the following factual findings.

## FACTS

On January 10, 2020, Agent Walker obtained information from a fellow agent (S/A Verrill) that the agency had received an anonymous tip on its "tip line" via email, concerning Timothy Barclift. A day earlier – January 9, 2020 – Det. Estes with the Augusta Police Department also received an anonymous tip about Mr. Barclift on that agency's anonymous tip line via email. The information conveyed in both tips was identical in several material respects, suggesting that they were made by the same person.

Specifically, the "tipster" provided information that Barclift regularly travelled to Maine (Brunswick and Augusta) from New York transporting hundreds of grams of illegal drugs – heroin and/or cocaine – in a backpack, and had been doing so for years. The tipster stated that Barclift made multiple trips to Maine by bus (Concord Trailways), typically carried a firearm, was dangerous and was known by his rapper alias as "DownLeezy." The tipster stated that Barclift stayed in Maine for just a few days, then returned to New York, and then would come back to Maine with more drugs. The tipster gave Barclift's date of birth that was inaccurate by a few days.

Agent Walker's colleague, S/A Verrill, had a contact in Boston, apparently with Concord Trailways, who provided information that Barclift had purchased 10 bus tickets to Maine in January, 2020, and had made four trips by January 9, 2020. A similar pattern was followed in prior months for several years. That source indicated that Barclift always paid cash for the tickets. Walker and Estes, using FaceBook and YouTube, confirmed that Barclift's alias was, indeed, "DownLeezy," and that he performed rap music. The officers obtained a photo ID of Barclift from law enforcement authorities in New York and confirmed his prior criminal record to include a crime of violence and involvement with drugs.

The officers learned that Barclift was making a bus trip to Augusta on January 22, 2020 and would be arriving at approximately 4:20 pm. The source in Boston described the clothing that Barclift was wearing. A surveillance team of about 8 officers and agents was assembled, including Cpl. Record of the Maine State Police with his certified drug-detection K-9, Tess. The team was briefed and deployed in the area of the Concord Trailways Bus Terminal in Augusta to await the arrival of the bus Barclift was said to be on.

At approximately 4:20 pm, the bus pulled up at the terminal in Augusta and the passengers began to disembark. Barclift got off the bus and was recognized by the police from his New York photo and his Facebook and YouTube videos. He was wearing a backpack and carrying a black plastic bag. He walked through the terminal building and exited, approaching a waiting gray SUV operated by a female driver. Barclift placed his backpack and the plastic bag in the right rear passenger seat area and then got into the front passenger seat. Before he could close the door, multiple police vehicles converged on the SUV, and several officers had their guns drawn and pointed at the vehicle and its occupants. One of those officers was Cpl. Record, who drove his cruiser straight at the SUV, essentially blocking it head-on. Record got out of his cruiser and approached the SUV, with his side-arm drawn and pointed at Barclift.

Barclift immediately got out of the SUV with his hands raised in the air. Because Cpl. Record had inadvertently failed to activate the audio on the cruiser camera, it cannot be determined what words were spoken to or between the officers and Barclift. Nevertheless, it is obvious that Barclift was told to place his hands on the hood of the SUV and he promptly complied. Record immediately handcuffed Barclift behind his back. Record then performed a pat-down and search of Barclift,

3

including removing all items from his pockets and placing them on the hood of the SUV.[1]

While this was going on, other officers had directed the driver of the SUV to get out. Other officers opened several of the doors to the SUV. It is clear from the video from Cpl. Record's cruiser camera that officers spoke to Barclift and he spoke to them, but none of the witnesses at the hearing could recall what was said.[2]

Barclift was asked or told to move away from the SUV and stand to the side, as shown in the cruiser video. By this time, approximately 3 minutes had elapsed from the time that Cpl. Record and the other officers had converged on the SUV and effectuated the "stop." At this time Record can be seen on the bus terminal video going to his cruiser and retrieving Tess, his drug detecting K-9. There was testimony that Tess has been certified every year she has been in service, that she is certified for narcotics, people, vehicles, packages and areas, but not for marijuana. Record has been a K-9 handler since 2000.

Once Tess was removed from Record's cruiser, she was "deployed" on Mr. Barclift and gave a positive indication that the odor of narcotics was present on him, indicating that Barclift had recently been in the presence of narcotics. Record told the other officers and agents that the dog has made a positive alert on Barclift and at that point Tess was deployed on the SUV. Tess indicated on the right rear passenger door area of the SUV. According to Cpl. Record, the right back seat area was full of bags and the dog, who is aggressive with odor, could not get at the source of the

---

[1] It is not necessary for the court to decide whether Cpl. Record's search of Barclift exceeded the permissible scope of a *Terry*-type pat-down and search, since no items of any evidentiary value were found on Barclift's person.

[2] Counsel for Mr. Barclift requested the court to exclude any words spoken by Barclift made while he was in front of the bus terminal and handcuffed, on the basis that none of the testifying officers could recall what was said. The court declines to do so at this time. The court will not speculate as to what the testifying officers or other officers may or may not remember by the time the trial in this case is held.

4

indication. The cruiser video clearly shows that Tess entered the SUV on the right side, in both the front and the back, and later entered the SUV on the front driver's side.

Because Tess indicated in the area where all the bags were located, Record called for a "line" bag search so that the bags could be isolated. Agents then removed the bags from the right rear passenger area and placed them on the pavement by the side of the SUV. Once this was done, Tess can be seen aggressively biting on the backpack Barclift had carried with him from the bus and placed inside the SUV. From the time Cpl. Record first deployed Tess on Mr. Barclift, to the time the dog indicated on the backpack and Tess was returned to the cruiser, 4 minutes had elapsed. When the backpack was searched by Agent Walker, it was found to contain tied plastic bags containing over 300 grams of cocaine, as well as a wallet and credit cards linked to Timothy Barclift.

At that point, Barclift was formally arrested and transported to the Augusta Police Department, where he was brought to a booking room. He was in the booking room for about 20 minutes in the company of another officer, and it appears that he was allowed a smoke break and/or bathroom break during that period of time. At about 20 minutes into the video, Agent Walker came into the room and sat down at a desk across from Mr. Barclift, who was still handcuffed, but now in front of him rather than behind his back.

At approximately 20:01 of the video (State's Exhibit 3), Agent Walker says: "Alright then, I'll be straight up with you, when we were out there at the bus station, like I said, someone in your circle . . . ." Barclift interrupted and was incredulous, and wanted to know who the person was because he had no "circle." Walker explained that the information had come from an anonymous source, but it must have come from someone who knew a lot about Barclift. Det. Estes, who was also

in the booking room at this time but off-camera, chimed in to say that the information came from someone who "knew all about you." Barclift remained perplexed.

Agent Walker continued: "So, we started to get information, and through this information we started to look into what's been going on, you been coming up here for a long time, haven't you?" Barclift immediately agreed and told the officers that he'd been coming up to the area since 2009. When asked by Walker if he "came up and hung out," Barclift agreed and added that "I get high a lot." Officer Estes remarked that he had seen Barclift's videos, which he thought were good. Barclift confirmed that he came up with his "party," and that he always brought his "party" with him, that it was not with "intent" and that he gets high as a "m_ _ _ _ _ f _ _ _ _ r." He said that he leaves and comes back frequently, but he always has his "medicine." He denied that he sold any drugs and he reminded the officers that he had been free for 21 years.

At 24:20 of the video, Agent Walker told Barclift that he needed to complete the formalities and was about to read him the *Miranda* warnings/rights. Walker read each warning/right to Barclift, who responded that he understood each one. When asked if he wanted to answer questions, Barclift said: "Sure. Shoot." He then signed the Waiver form. (State's Exhibit 2). Thereafter, Barclift gave a full statement in response to questions posed by Agent Walker and Det. Estes.

## DISCUSSION

The Defendant seeks suppression of any evidence seized as a result of the search of his backpack on the ground that the police lacked reasonable articulable suspicion to stop the SUV based on the anonymous tip and, further, that the search of the backpack was unsupported by probable cause. In addition, the Defendant maintains that his detention was a *de facto* arrest and that he was in custody during his time at the bus terminal. Accordingly, he claims that any statements made by him at the bus station should be excluded because he was not properly advised of his

6

*Miranda* warnings/rights. Finally, he asserts that any statement made by him prior to the administration of *Miranda* warnings/rights while he was in the booking room at the Augusta Police Department should be suppressed. The Defendant does not appear to be challenging the statements he made after he was advised of his *Mirandas* rights and waived them.

A. *The Stop.*

The Law Court has recently reaffirmed that "[a] stop is justified when an officer's assessment of the existence of specific and articulable facts indicating a possible violation of law or a public safety risk is objectively reasonable considering the totality of the circumstances." *State v. Simmons,* 2016 ME ME 91, ¶ 9, *quoting State v. Connor,* 2009 ME 91, ¶ 10, 977 A.2d 1003. "[T]he threshold for demonstrating an objectively reasonable suspicion necessary to justify a vehicle stop is low . . . . The suspicion need only be more than a speculation or an unsubstantiated hunch." *State v. LaForge,* 2012 ME 65, ¶ 10, 43 A.3d 961. "When an investigating officer's actions during the stop 'exceed what is necessary to dispel the suspicion that justified the stop, the detention may amount to an arrest and is lawful only if it is supported by probable cause." *State v. Blier,* 2017 ME 103, ¶ 8, 162 A.3d 829, *quoting State v. Donatelli,* 2010 ME 43, ¶ 12, 995 A.2d 238.

The court concludes that the police possessed reasonable, articulable suspicion to stop the SUV, which was waiting to pick up Barclift and into which he had placed his bags, including his backpack. The anonymous tip, while not 100% accurate in every respect, was highly detailed and was corroborated by the independent investigation of the police. The fact that Barclift made very frequent bus trips to and from New York and Augusta was, in itself, highly suspicious. While it is true that the police mobilized in force for the stop, this was to be expected given the information that led the police to believe that Barclift was importing large

7

quantities of narcotics into the area and that, according to the tipster, was known to carry a firearm.

Once the stop was effectuated, the police acted promptly to either confirm or dispel their suspicions. Within 3 minutes of the stop, Tess was deployed and quickly indicated that Barclift had recently been in the presence of narcotics. At that point, the court finds that the suspicions of the police ripened into probable cause to believe that Barclift had brought illegal narcotics to Augusta. This was further confirmed by the fact that Tess indicated on the area of the SUV where Barclift had placed his backpack. When Tess aggressively indicated on the backpack itself, the police had probable cause to search it.

*B. Statements at the Bus Stop.*

The court declines to make any ruling on the question of whether statements made by Barclift while handcuffed at the bus terminal in front of the SUV are admissible for any purpose at trial. The court has no evidence as to what was said by Barclift or whether the State will seek to offer at trial any statement or comment made by him at that time. Prior to trial, the State shall inform the court and Defense Counsel whether it intends to offer any such statements or comments and what they are. The court will then rule on the issue in advance of trial.

*C. Statements at the Police Station.*

In *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980) the United States Supreme Court held that the "term 'interrogation' under *Miranda* refers not only to express questioning but also to any words or actions on the part of the police (other than those normally attendant to arrest or custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." The court agrees with the Defendant that the statements made by Agent Walker prior to his administration of the *Miranda* warnings/rights, were such that he knew or should have known were reasonably likely to elicit an incriminating response from Barclift

8

and, therefore, amounted to interrogation within the meaning of *Innis*. Because that colloquy was not preceded by *Miranda* warnings, any statements made by Barclift before he waived *Miranda* must be excluded in the State's case in chief. *See also State v. Fleming*, 2020 ME 120, ¶¶ 26-33, 239 A.3d 648.

## CONCLUSION

The entry is:

The Defendant's motion to suppress is GRANTED as to statements made by him while at the Augusta Police Department on January 22, 2020, prior to the administration and waiver of *Miranda*, but in all other respects the motion is DENIED.

Dated: March 29, 2021

William R. Stokes
Justice, Superior Court

9