STATE OF MAINE     UNIFIED CRIMINAL DOCKET
OXFORD, ss.      DOCKET NO. OXFCD-CR-20-250

STATE OF MAINE    )
          )
          ) **ORDER ON MOTION TO VACATE**
 v.        ) **VERDICT AND FOR NEW TRIAL**
          )
          )
BRETT HASTINGS    )

## Introduction

Defendant Brett Hastings has moved for a new trial. His motion is based on information he received after trial that one of the jurors commented, regarding the defendant, "He looks like one of [']em Iraqies [sic] or Saudies [sic], hang him." For the following reasons, the defendant's motion is **GRANTED**.

## Procedural History

The defendant was charged by indictment with aggravated assault, domestic violence assault, domestic violence criminal threatening, and criminal mischief in connection with an incident that was alleged to have taken place on May 27, 2020, in Woodstock, Maine. The court conducted jury selection on June 8 and 10, 2022, and empaneled a jury of twelve members with three alternates.[1] The trial began on June 21, 2022, and lasted for two days. The jury returned a guilty verdict on all counts on the afternoon of June 22.

---

[1] One of the alternate jurors did not show up for trial.

By a filing dated July 6, 2022, the defendant moved to vacate the verdict and for a new trial.[2] Attached to the defendant's motion was an e-mail from an alternate juror reporting a comment that a Hastings juror allegedly made to her at jury selection. The court subsequently conducted a telephonic conference with counsel for both parties. The court and the parties agreed that the e-mail from the alternate juror warranted further investigation.

As a result, counsel and the court met in chambers on July 14, 2022, to interview the alternate juror. Based on that interview, the court and parties identified Juror No. 169 as the person about whom the alternate juror made her report. On July 20, 2022, the court interviewed Juror No. 169 with the lawyers in attendance. On July 29, 2022, again with the lawyers present, the court interviewed five other members of the jury. On August 5, 2022, the lawyers were in attendance when the court interviewed two more jurors, one of them by videoconference. By that point, the court had met with nine of the 14 individuals who had participated in trial as jurors or alternates. The interviews were conducted on the record, in camera, with the court placing each interviewee under oath. On each occasion, the court solicited proposed questions from the attorneys in advance and, during each interview, allowed the lawyers to propose additional questions based on what they had heard.

---

[2]    M.R. Crim. P. 33 requires a motion for a new trial to be made within 14 days after the verdict "or within such further time as the court may fix during the 14-day period." Although the defendant's motion is dated July 6, 2022, it appears that the court received it on July 8, 2022. The State, however, has not raised a timeliness bar to the defendant's motion.

2

Although the Clerk's Office contacted all 14 of the seated jurors and alternates, one refused to participate in the interviews and four did not return the court's telephone call. With the agreement of counsel, the court concluded its investigation after conducting the nine interviews and did not attempt to force the remaining jurors to participate.

The court permitted the parties to file supplemental briefs addressing the information learned during the juror interviews. The State opposes the defendant's request for a new trial. Neither party requested oral argument and the court has determined that oral argument is not necessary.

## Facts

According to the defendant, he was born to one white parent and one Mexican parent. He has brown skin, and dark hair and eyes. The indictment lists the defendant's race as "[w]hite." The defendant did not alert the court to any mistake in the indictment prior to trial.[3] As a result, at jury selection, the court did not ask prospective jurors any questions designed to identify possible racial biases.

The alternate juror was empaneled with the rest of the jury on June 10, 2022. She did not know of her status as an alternate until she was discharged at the close of evidence. She has worked as a legal assistant for a local attorney for approximately six years. The alternate juror was excited to be selected for the jury. She considers jury service to be an important civic duty.

---

[3] Defense counsel indicates that he was "blind" to this issue until he received the e-mail from the alternate juror, at which point he confirmed with the defendant's family that the defendant is biracial. Motion to Vacate ("Mot.") at 2.

3

On either the second day of jury selection or the first day of trial, after the jurors had seen the defendant, the alternate juror heard another juror comment[4]: "He looks like one of [']em Iraqies [sic] or Saudies [sic], hang him."[5] Although the alternate juror was troubled by this comment, she did not report it during the trial because she did not know how to do so. The alternate did not hear any other juror make any comment regarding the defendant's race. She also did not hear any of the jurors discuss the evidence during the trial or otherwise engage in premature deliberations. The alternate was excused before the jury deliberated. She was

---

[4]    The alternate juror had trouble remembering whether the comment was made at jury selection or once the trial had begun, but her best memory was that the trial had begun. *Compare* Chambers Conf. Tr., July 14, 2022, 12:10-13:14 (describing comment as having been made during jury selection and recalling her "hope that that person [who made the comment] isn't picked [for the jury]") *with id.* at 44:11-46:16 (clarifying that she believed comment was made on the first trial day, and that when she heard the comment, she hoped the juror "was an alternate and not going to deliberations"). The defendant was introduced to the jury panel on the second day of jury selection. He was also present in the courtroom for both days of trial. The alternate was certain that the person who made the comment ultimately served on the jury.

[5]    This is the phrasing the alternate juror used in her e-mail of June 24, 2022, where she wrote: "I feel the 'jury, or member (s) of' came across as prejudice[d] toward defendant stating 'he looks like one [']em Iraqies [sic] or Saudies [sic], hang him. Others in room laughed. I was unsure if it was a joke or true feelings, until I heard their verdicts on all 4 counts." Exhibit B to Mot.

When she was interviewed on July 14, the alternate juror reported the comment as: "Well, look, he looks like[] he's from Iraq[] or Iran or, you know, that area, we should hang him." Chambers Conf. Tr., July 14, 2022, 12:25-13:1-2. Although the court credits the alternate juror's earlier recitation of the comment because it was made closer in time to jury selection and trial, the substance of the comments is similar, and the exact wording does not affect the court's analysis.

4

disappointed to have been excused, but not angry or upset by it, as she understood the importance of having alternates on the jury.

On June 24, 2022, two days after the guilty verdict, she sent an e-mail to her boss. The same day, the attorney forwarded that e-mail to defense counsel in this case. In the e-mail, the alternate described the racially biased comment she heard and opined that certain members of the jury did not view the defendant with "open minds." Exhibit B to Mot. She indicated that had she deliberated, there would have been a "hung jury." *Id.* She also expressed frustration with the outcome of the trial and significant skepticism of the State's case.[6]

In her interview with the court, the alternate juror provided a detailed description of the juror who made the comment she found problematic. The court has concluded, and the parties agree, that the alternate was speaking about Juror No. 169.[7]

---

[6]    For example, the alternate juror referred to the victim in the case, a young adult woman, as a "little girl" who had "ruined a working man's life . . . ."; surmised that the victim's ripped sweatshirt, which was admitted in evidence, was "tampered with"; and was dismissive of evidence that the victim had been concussed. Exhibit B to Mot.

[7]    The alternate described the juror in question as a larger man who was approximately six-feet tall and had a white beard and white hair. He wore colorful, short-sleeved, collared shirts. She guessed that he was about her age, which was mid-sixties. The alternate juror ate lunch at McDonald's with the juror who made the comment. She remembered that the juror sat in the front row of the jury box, a few seats away from the foreperson, and she recalled that the juror's brother-in-law was on the jury.

Juror No. 169 is in his late sixties, and he matches the physical description the alternate juror provided. At trial, he wore patterned, short-sleeved, buttoned-up shirts that he described as "loud." Chambers Conf. Tr., July 20, 2022, 21:16. He

5

Juror No. 169 denies making the comment the alternate attributed to him. He could not recall making any statement about the defendant's race either during jury selection or during the trial but acknowledged he may have said something "in a joking way." Chambers Conf. Tr., July 20, 2022, 7:11-12. He thought the defendant "looked like he was Mexican." *Id.* at 8:20-21.

The other jurors the court interviewed did not hear anyone make a comment about the defendant's race and several commented that they found their fellow jurors to be fair and impartial. Thus, the court is left with the competing recollections of the alternate juror and Juror No. 169.

The court credits the alternate's testimony, for three reasons. First, the alternate juror had no motive to fabricate the allegation. The State challenges the credibility of the alternate juror and describes her as "admittedly biased." State's Opposition ("Opp.") at 9. It is true that the alternate juror did not agree with the verdict, and some of the statements in her e-mail to her boss suggested hostility to the State's case. In person, however, the alternate demonstrated no agenda, beyond concern for the fairness of the trial process. *See* Chambers Conf. Tr., July 14, 2022, 32:20-23 ("I feel that [the defendant's] life's been ruined from this verdict. I also feel for the victim . . . I feel for both of them equally."); *id.* at 34:25-35:3 ("I know that there were two charges that I didn't feel were 100 percent proven and two charges that he admitted to that were definitely 100 percent."); *id.* at 35:12, 35:24-36:1

---

recalled eating lunch at McDonald's with the alternate juror. Juror No. 169 sat in the front row of the jury box, and his former brother-in-law, Juror No. 99, sat immediately behind him.

6

("[T]his is [the jurors'] civil duty . . . The young lady's life was at stake, the young man's life was at stake."). She stated that she would have brought the information about the juror's comment to her boss's attention even if the jury had returned a different verdict, because she believed there was "some bigotry or bias . . . involved." *Id.* at 30:25-31:1. She also allowed for the possibility that Juror No. 169 was joking. *Id.* at 25:9-19 (acknowledging that she did not know if the comment was a "joke" or "whether [the juror] was really stating how he felt"). While the alternate juror felt sympathy for the defendant, the court finds no basis on which to conclude that she would concoct this allegation to disturb the verdict.

The State also argues the court should not credit the alternate juror's testimony because she was confused about when the comment was made and who else heard it. Opp. at 2. The alternate juror acknowledged that she could not remember whether she heard the comment at jury selection or after the trial began. Yet she did not waver in her recollection of the nature of the comment, who said it, or that it was directed towards the defendant after the jurors initially observed him either on the second day of jury selection or on the first day of trial. The court also does not place significant weight on the fact that none of the other interviewed jurors heard Juror No. 169's comment. While the alternate juror testified that she recalled "someone else [on the jury] agreeing" with the comment, Chambers Conf. Tr., July 14, 2022, 24:12-13, she was equivocal on that point, *id.* at 45:20-46:10 (stating she could not "remember now" whether the comment was made in the presence of other Hastings jurors). It is possible the comment was made at jury

7

selection in the presence of individuals who were not ultimately selected to serve on the Hastings jury, or that the comment was heard by one of the five Hastings jurors the court did not interview. The court need not resolve that issue. On balance, the alternate juror's memory of the nature and context of the comment was reliable.

Second, although Juror No. 169 may not recall making the specific comment that was attributed to him, the juror made other statements during his interview that corroborate the alternate's version of events. Most significantly, after first denying that he would say anything as "mean or blunt" as what the alternate reported, Chambers Conf. Tr., July 20, 2022, 9:7, Juror No. 169 later acknowledged that he may have made jokes in the past about hanging people of Iraqi or Saudi heritage. His previous use of the same specific and incendiary language reported by the alternate cannot be ascribed to mere coincidence. Juror No. 169 seemed to admit that he sometimes makes inappropriate remarks, stating that he "should learn to keep [his] mouth shut . . . ." *Id.* at 26:19-20; *see also id.* at 28:8 (worrying that he had "mess[ed]" the trial up). Indeed, during his interview with the court, Juror No. 169 made several comments that contradicted his assertion that he does not generalize based on race or ethnicity. He shared that shortly before the Hastings trial, he lost $300 in a financial scam perpetrated by "people from India . . . or in that area." *Id.* at 10:10-11. He believed the person who defrauded him was from India because the person "had an Indian accent or he typed like an Indian." *Id.* at 11:5-6. Juror No. 169 wrote to the person who scammed him, "You keep treating people like this, you're not going to get your 76 virgins . . . ." *Id.* at

8

14:19-21. As a result of this experience, Juror No. 169 stated that he "didn't have a good idea of them," *id.* at 10:11-12, and "didn't like 'em," *id.* at 11:2-3, apparently referencing people from India. When sharing this story with the court and the lawyers, Juror No. 169 did not seem to appreciate the problematic nature of his remarks. This all supports the alternate's testimony that Juror No. 169 made the reported comment.

The State points out that Juror No. 169 correctly identified the defendant as having Mexican heritage. From this, the State surmises that the alternate juror overheard Juror No. 169 making a comment about the person who defrauded him, "and in a post-verdict cognitive reframing she reasoned it must have been targeted at the defendant." Opp. at 9. Juror No. 169's guess as to the defendant's ethnicity was made after the juror observed the defendant over the course of two trial days; by contrast, the alternate heard Juror No. 169's comment about hanging the defendant shortly after the defendant was first introduced to the jury, either at jury selection or at trial. The comment the alternate heard may be reflective of an early judgment that Juror No. 169 made, and then apparently later revised, as to the defendant's background. It is also possible that the juror always correctly identified the defendant's ethnicity, but nonetheless likened him to individuals from the Middle East because of the color of his skin.

Third, Juror No. 99 corroborated that Juror No. 169 was known to use racially derogatory terms. Juror No. 99 and Juror No. 169 used to be brothers-in-law (they were married to sisters). Before Juror No. 169's wife died, the two men

9

interacted two or three times per year. Prior to jury service, they had not seen each other for approximately one year. By happenstance, they were both seated on the Hastings jury (the two men disclosed their familial relationship at jury selection). Juror No. 99 testified that he knew Juror No. 169 to "often" use a racial slur to describe Black people. Chambers Conf. Tr., July 29, 2022, 7:10-13. Juror No. 99 did not recall that Juror No. 169 made any comments about the defendant's race.[8] Juror No. 99 had no discernible motive to lie about his former brother-in-law's propensity to use racial slurs. This, too, corroborates the alternate juror's testimony.

In sum, the court concludes that the alternate juror accurately reported Juror No. 169's comment, and that the comment was directed at the defendant.

## Discussion

The Sixth Amendment to the United States Constitution guarantees the right of an accused "to a speedy and public trial, by an *impartial* jury." U.S. Const. amend. VI (emphasis added); *see also* Me. Const. art. I, § 6 (guaranteeing the right to a "speedy, public and *impartial* trial" (emphasis added)). An impartial jury is one

---

[8]    He did recall that at the beginning of deliberations, Juror No. 169 announced something like, "He's guilty. Let's do it." *Id.* at 7:18-23. In the chambers conferences, the court asked jurors to refrain from discussing statements made during deliberations. At that time, the court was not aware of any issues that may have occurred during deliberations, and thus chose to focus its inquiry on the juror's pre-deliberation comment. Although Juror No. 99 received that instruction, he volunteered the above statement by Juror No. 169. As discussed *infra* at 17, the court is not prohibited from considering comments made during deliberations where, as here, there is evidence of juror racial bias. Nonetheless, by agreement of the parties, the court has excluded this evidence from its analysis.

10

"capable and willing to decide the case solely on the evidence before it." *Smith v. Phillips*, 455 U.S. 209, 217 (1982). Courts must be particularly attuned to the problem of racial bias in the jury system. *Peña-Rodriguez v. Colorado*, 580 U.S. 206, 223 (2017) ("Permitting racial prejudice in the jury system damages 'both the fact and the perception' of the jury's role as 'a vital check against the wrongful exercise of power by the State.'" (quoting *Powers v. Ohio*, 499 U.S. 400, 411 (1991)); *State v. Fleming*, 2020 ME 120, ¶22, 239 A.3d 648 (discussing the importance of courts crafting procedures to "confront [racial] biases in our justice system"). "The jury is to be a criminal defendant's fundamental protection of life and liberty against race or color prejudice." *Peña-Rodriguez*, 580 U.S. at 223 (internal quotation marks and citations omitted). Here, the defendant asserts that his Sixth Amendment right to an impartial jury was violated in two ways: first, because Juror No. 169 did not honestly answer questions at voir dire that bore upon the juror's impartiality and second, because Juror No. 169 harbored racial or ethnic bias against the defendant. M.R. Crim. P. 33 permits the court to "grant a new trial to the defendant if required in the interest of justice."

### 1. Dishonesty at Jury Empanelment

"To obtain a new trial on an allegation that a juror did not accurately answer a voir dire question, a party must demonstrate that (i) the juror failed to honestly or correctly answer a material question, and (ii) a correct response would have provided a valid basis for a challenge for cause." *State v. Chesnel*, 1999 ME 120, ¶ 29, 734 A.2d 1131 (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S.

548, 556 (1984)). Here, the defendant argues that a new trial is warranted because Juror No. 169 was not truthful during jury selection when asked if he could be fair and impartial. Defendant's Supplemental Brief ("Supp. Br.") at 5; *see also* Defendant's Reply Brief at 1-2.

On this record, the defendant cannot demonstrate that Juror No. 169 improperly answered a voir dire question. It is true that the juror did not disclose any bias against the defendant during jury selection. Of course, the defendant did not propose that the court ask questions designed to elicit information about racial bias or inform the court that he was incorrectly identified as white on the indictment. *See Chesnel*, 1999 ME 120, ¶ 31, 734 A.2d 1131 (suggesting that the party seeking a new trial must have requested "specific questions during voir dire designed to elicit the concealed information from the prospective juror" (quoting Robert G. Loewy, *When Jurors Lie: Differing Standards for New Trials*, 22 Am. J. Crim. L. 733, 744 (1995))).

The First Circuit has recognized that "a person who harbors a bias may not appreciate it and, in any event, may be reluctant to admit her lack of objectivity." *Sampson v. United States*, 724 F.3d 150, 164 (1st Cir. 2013). This is especially likely to be the case where, as here, the court has not asked questions that cause jurors to reflect on their views about people of a different race or ethnicity. *See Fleming*, 2020 ME 120, ¶ 20, 239 A.3d 648 ("Questioning potential jurors about their *explicit* views, opinions, or beliefs about people of a different race is a critical step in achieving the ultimate goal of the voir dire process: detecting bias and

12

prejudice in prospective jurors."). A court should not set aside a jury verdict unless it is "sufficiently clear that [a juror's] nonanswer is apparently a dishonest or incorrect answer to the question in the context in which it was asked." *Chesnel*, 1999 ME 120, ¶ 31, 734 A.2d 1131. Here, the questions the court posed at jury selection—about impartiality generally—were not sufficiently specific to demonstrate that Juror No. 169's nonanswer was dishonest or incorrect. The court finds that the defendant has failed to show that Juror No. 169 dishonestly answered a material voir dire question.

### 2. Juror Bias

The defendant argues in the alternative that Juror No. 169 was not fair and impartial, and that the presence of even one biased juror is a structural error that demands a new trial. Supp. Br. at 5. The parties agree that the defense has the burden of proving the existence of juror bias by a preponderance of the evidence. *Sampson*, 724 F.3d at 166. In other words, the defense must demonstrate that the juror in question lacked either "the capacity [or] the will to decide the case solely on the evidence." *Id.* As a preliminary matter, the court must determine whether it can even consider the evidence of Juror No. 169's pre-deliberation comment after the jury has returned a guilty verdict.

"Courts should inquire into the validity of a jury verdict only in 'very limited circumstances,' and should be very cautious in overturning jury verdicts." *State v. Watts*, 2006 ME 109, ¶ 17, 907 A.2d 147 (quoting *State v. Fuller*, 660 A.2d 915, 917 (Me. 1994)). Inquiries into jury deliberations are strongly disfavored. *Id.* "A

general rule [the "no-impeachment rule"] has evolved to give substantial protection to verdict finality and to assure jurors that, once their verdict has been entered, it will not later be called into question based on the comments or conclusions they expressed during deliberations." *Peña-Rodriguez*, 580 U.S. at 211; *see also Patterson v. Rossignol*, 245 A.2d 852, 856 (Me. 1968) ("It is the general rule since Lord Mansfield's time that the testimony of a juror is not available to impeach a verdict in which [that juror] participated.").

In Maine, the "no-impeachment rule" is codified by Maine Rule of Evidence 606(b), which provides that a court may not consider "testimony or other evidence" about "[a]ny statement made or incident that occurred during the jury's deliberations; [t]he effect of anything on that juror's . . . vote; or [a]ny juror's mental processes concerning the verdict." M.R. Evid. 606(b)(1); *State v. Leon*, 2018 ME 70, ¶ 9, 186 A.3d 129 (citations omitted).[9] Rule 606(b) reflects the "settled doctrine of

---

[9]     Rule 606(b) reads in full:

**(b) During an inquiry into the validity of a verdict or indictment.**

  **(1)** *Prohibited testimony or other evidence.* During an inquiry into the validity of a verdict or indictment, a juror may not testify about:

   **(A)** Any statement made or incident that occurred during the jury's deliberations;

   **(B)** The effect of anything on that juror's or another juror's vote; or

   **(C)** Any juror's mental processes concerning the verdict or indictment.

   The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

14

this State" that evidence of juror statements "may be offered only to show external misconduct of individual jurors or the exertion of outside influence upon the jury." *Marr v. Shores*, 495 A.2d 1202, 1204 (Me. 1985) (internal quotation marks and citations omitted). The Law Court has identified several policy considerations in support of this rule, among them

> (1) the need for stability of verdicts; (2) the need to conclude litigation and desire to prevent any prolongation thereof; (3) the need to protect jurors in their communications to fellow jurors made in the confidence of secrecy of the jury room; (4) the need to save jurors harmless from tampering and harassment by disappointed litigants; [and] (5) the need to foreclose jurors from abetting the setting aside of verdicts to which they may have agreed reluctantly in the first place or about which they may in the light of subsequent developments have doubts or a change of attitude.

*Patterson*, 245 A.2d at 857.

This case does not involve allegations of any "statement made or incident that occurred during the jury's deliberations." M.R. Evid. 606(b)(1). Thus, the court, with the parties' assent, avoided inquiry into the deliberations themselves. Yet Rule 606(b) also bars the court's consideration of "evidence of a juror's statement" to demonstrate "[t]he effect of anything on that juror's . . . vote; or [the] juror's mental processes concerning the verdict." *Id.* Arguably, then, the alternate

---

**(2)** *Exceptions.* A juror may testify about whether:

> **(A)** Extraneous prejudicial information was improperly brought to the jury's attention; or

> **(B)** An outside influence was improperly brought to bear on any juror.

15

juror's report of Juror No. 169's pre-deliberation comment, if offered to show that Juror No. 169 could not deliberate fairly, triggers the no-impeachment rule absent an applicable exception. *See United States v. Fuentes*, No. 2:12-cr-50-DBH, 2013 U.S. Dist. LEXIS 115459, at *24 (D. Me. Aug. 15, 2013) (finding that the analogous Fed. R. Evid. 606(b) "covers other things [beyond comments made during deliberations] that bear upon the validity of a verdict" (quotations omitted)); 27 Charles Alan Wright et al., Federal Practice and Procedure § 6074 n.20.1 and accompanying text (2d ed. 2013) ("[S]o long as a verdict . . . has been reached, [Federal] Rule 606(b) applies even where the evidence offered relates to events that preceded the verdict . . .").

Among the exceptions to the ban on reexamination of a verdict are allegations that "outside influence was improperly brought to bear on any juror." M.R. Evid. 606(b)(2)(A). The court has not found any precedent discussing whether a juror's own biases constitute "outside influence," but the Law Court has suggested, without explicitly holding as much, that Rule 606(b) does not bar consideration of evidence of juror bias. *Leon*, 2018 ME 70, ¶¶ 12, 14, 186 A.2d 129 (noting that Rule 606(b) does not prohibit a court from investigating reports of "bias by any of the jurors" after a verdict has been reached). Ultimately, the court need not determine whether Rule 606(b) precludes inquiry into the validity of a verdict based on a juror's *pre*-deliberation statements. Even assuming that it does, recent

16

Supreme Court precedent dictates that in this case, the evidentiary rule must yield to the defendant's Sixth Amendment rights.[10]

In the *Peña-Rodriguez* case, the Supreme Court considered "whether the Constitution requires an exception to the no-impeachment rule when a juror's statements indicate that racial animus was a significant motivating factor in his or her finding of guilt." 580 U.S. at 221. The Court answered that question in the affirmative, holding that "where a juror makes a clear statement that indicates he or she relied on racial stereotypes or animus to convict a criminal defendant, the Sixth Amendment requires that the no-impeachment rule give way" for the trial court to investigate the alleged statement. *Id.* at 225; *see also United States v. Villar*, 586 F.3d 76, 87 (1st Cir. 2009) (holding that federal trial courts "have the discretion to inquire into the validity of [a] verdict by hearing juror testimony to determine whether ethnically biased statements were made during jury deliberations and, if so, whether there is a substantial probability that any such comments made a difference in the outcome of the trial"). Here, the court has, with the parties' agreement, conducted that investigation.

Having determined that the court can consider the evidence of Juror No. 169's pre-deliberation statement, the court next must determine whether that statement—"He looks like one of [']em Iraqies [sic] or Saudies [sic], hang him."—demonstrates ethnic or racial bias against the defendant. As the State points out,

---

[10]     The parties agree that Rule 606(b) does not bar the court's inquiry in this case.

Juror No. 169 believes (correctly) that the defendant has Latino heritage and is not of Iraqi or Saudi descent. Thus, the State asserts that Juror No. 169 showed "no bias . . . against any racial, ethnic, or national group to which the defendant belongs or is descended." Opp. at 8.

The court's task is to determine whether the juror was "capable and willing to decide the case solely on the evidence before [him]." *Smith v. Phillips*, 455 U.S. at 217. As discussed *supra* at 6-10, the juror's comment was directed at the defendant. The remark conveys animosity towards people who hail from Iraq or Saudi Arabia, or "look[] like" they do. It also suggests a belief that people who share certain physical characteristics do not deserve the same trial rights as others. The comment thus demonstrates prejudice against the defendant based on the color of his skin. Even if Juror No. 169 did not believe the defendant to be Iraqi or Saudi, he placed the defendant in a category of people who, in the juror's mind, are not entitled to the presumption of innocence.

Of course, "[n]ot every offhand comment indicating racial bias or hostility will justify" setting aside a verdict. *Peña-Rodriguez*, 580 U.S. at 225; *see also Fuentes*, 2013 U.S. Dist. LEXIS 115459, at *21-23 ("Not every juror misstatement during a trial necessarily invalidates a verdict."). Juror No. 169's remark may have been a poor attempt at a joke. He presented as friendly and gregarious, and he asserted that he would not judge someone based on their racial or ethnic background. These assertions of impartiality, however, do not convince the court that the juror was impartial.

18

First, the court is hard-pressed to find humor in a comment about hanging someone because they look a certain way. Second, the "joke" was made during jury selection in a criminal trial—a solemn occasion at which the court instructed potential jurors on the importance of their role and the presumption of innocence that a criminal defendant enjoys. Third, the totality of the juror's remarks[11], both at jury selection and in his colloquy with the court, demonstrate prejudice against people who do not share his racial or ethnic background. As the Supreme Court has explained, when a juror "admit[s] prejudice," general statements of impartiality "can be given little weight." *Irvin v. Dowd*, 366 U.S. 717, 728 (1961); *see also State v. Berhe*, 193 Wn. 2d 647, 664, 444 P.3d 1172 (Wash. 2019) (noting that "a person may honestly believe and credibly testify that his or her actions were not influenced by racial bias, even where implicit racial bias did in fact play a significant role").

To be clear, the court does not find that Juror No. 169 was unfit to serve as a juror because he has used racial slurs in the past or because he made ethnic jokes. The court finds that he was unfit because he made a biased comment about the defendant *in this case* and because he demonstrated through his words and actions that he could not set his prejudices aside. Given the casual racism expressed by the

---

[11] As discussed *supra* at 8-9, the juror stated that he has a negative view of people from India because he was defrauded by one person who "typed like an Indian." When sharing that anecdote, he relied on religious stereotypes to make a joke about "76 virgins." In addition, Juror No. 99, who has a familial relationship with Juror No. 169, testified that Juror No. 169 in the past repeatedly used a racial slur to describe Black people. The court does not suggest that it typically would be appropriate during an inquiry into juror misconduct to ask family members about a juror's past. But in this case, where two family members were seated on the jury, the court will not ignore what Juror No. 99 shared about his former brother-in-law.

juror, the court is not convinced that he understands the nature of his prejudices. And because the juror is not fully cognizant of his own biases, he was not capable at trial of doing the necessary work to set them aside. The ability of jurors "to set aside their biases and return a fair verdict" is "central to the fairness of [a defendant's] trial." *Wilder v. United States*, 806 F.3d 653, 664 (1st Cir. 2015) (Torruella, J., concurring).

Thus, although the juror did not make a derogatory remark about Latinos, the court is convinced that the juror could not be the "impartial adjudicator" that the Constitution requires. *State v. Carey*, 2019 ME 131, ¶ 16, 214 A.3d 488. "A racially biased juror sits with blurred vision and impaired sensibilities and is incapable of fairly making the myriad decisions that each juror is called upon to make in the course of a trial. To put it simply, he cannot judge because he has prejudged." *Turner v. Murray*, 476 U.S. 28, 43 (1986) (Brennan, J., concurring in part and dissenting in part).

The Supreme Court has noted that seating even one biased juror infringes on a criminal defendant's Sixth Amendment right. *See Parker v. Gladden*, 385 U. S. 363, 366 (1966) (per curiam) (a defendant is "entitled to be tried by 12, not 9 or even 10, impartial and unprejudiced jurors"); *United States v. Martinez-Salazar*, 528 U.S. 304, 316 (2000) ("[T]he seating of any juror who should have been dismissed for cause . . . would require reversal"). In *Peña-Rodriguez*, however, the Court declined to address what standard trial courts should apply when determining whether evidence of juror racial bias is sufficient to grant a new trial, noting a split in the

20

circuit courts as to that issue. 580 U.S. at 228.[12] In the intervening years, the First Circuit and the Law Court have both held that juror bias causes a structural error. In 2018, the First Circuit stated that it "view[s] the presence of a biased juror as a structural error—that is, per se prejudicial and not susceptible to harmlessness analysis." *United States v. French*, 904 F.3d 111, 119 (1st Cir. 2018). Citing to that decision, the Law Court in 2019 determined that "[b]ecause of the constitutional rights at stake . . . if we do discern an error that affects the right to an impartial adjudicator, that error cannot be regarded as harmless." *Carey*, 2019 ME 131, ¶ 16, 214 A.3d 488.

Considering these precedents, the only appropriate remedy in this case is to vacate the verdict and order a new trial. The court does not undertake that step lightly. Both parties expended substantial resources in trying this case well and thoroughly. The "finality [of a jury's verdict] is also valuable," and in most cases the court will refrain from "setting aside a previously rendered verdict." *Sampson*, 724 F.3d at 154. Here, however, the defendant's Sixth Amendment rights must take priority. *Peña-Rodriguez*, 580 U.S. at 225. As Justice Sotomayor recently explained:

---

[12] At that time, the Seventh Circuit required defendants to show that "prejudice pervaded the jury room" and that there was "a substantial probability that the alleged racial slur made a difference in the outcome of the trial." *Shillcutt v. Gagnon*, 827 F.2d 1155, 1159 (7th Cir. 1987). In the Ninth Circuit, however, defendants were automatically entitled to a new trial upon a showing that one juror was racially biased. *United States v. Henley*, 238 F.3d 1111, 1120 (9th Cir. 2001) (just "one racist juror would be enough.").

It is ultimately the duty of the courts "to confront racial animus in the justice system." *Peña-Rodriguez*, 580 U.S. at 222. That responsibility requires courts . . . vigilantly to safeguard the fairness of criminal trials by ensuring that jurors do not harbor, or at the very least could put aside, racially biased sentiments. To address these "most grave and serious statements of racial bias" is "to ensure that our legal system remains capable of coming ever closer to the promise of equal treatment under the law that is so central to a functioning democracy." *Id.*, at 224.

*Thomas v. Lumpkin*, 598 U.S. \_\_\_\_, \_\_\_\_ (2022) (Sotomayor, J., dissenting from denial of certiorari).

The court concludes that Juror No. 169 could not put aside his "racially biased sentiments" about the defendant. *Id.* As a result, the defendant did not receive a fair trial.

## Conclusion

For the foregoing reasons, the defendant's motion to vacate the verdict and for a new trial is **GRANTED**.

DATED:   October 26, 2022

_____
Julia M. Lipez
Justice, Maine Superior Court

22