**UNITED STATES of America**

v.

**Farrell SUTHERLAND and Melissa Foster, Defendants.**

**Crim. No. 95–14–P–C.**

United States District Court,
D. Maine.

June 15, 1995.

Anthony L. Leffert, Asst. U.S. Atty., Portland, ME, for the Government.

Peter E. Rodway, Rodway & Horodyski, Portland, ME, for defendant Sutherland.

Andrew J. Cloutier, Cloutier, Barrett, Cloutier & Conley, Portland, ME, for defendant Foster.

*MEMORANDUM OF DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO SUPPRESS*

GENE CARTER, Chief Judge.

On March 21, 1995, a federal grand jury returned an indictment against Defendant Farrell Sutherland, charging him with rob-

bery of Key Bank and People's Heritage Bank, 18 U.S.C. § 2113(a), and Defendant Melissa Foster, charging her with aiding and abetting in the robbery of Key Bank, 18 U.S.C. §§ 2113(a) and 2. Both Defendants filed motions seeking orders suppressing evidence that was seized at the time of their arrest (Docket Nos. 13 and 16) and later as a result of a search of the house where they were staying (Docket Nos. 13, 16, 20, and 29) and statements they made to police following their arrest (Docket Nos. 14 and 15). Based on the evidence presented at the hearing, the Court concludes that Defendants' Motions to Suppress should be denied.

## I. FACTS

The following evidence was presented at the motion hearing. On March 9, 1995, the Key Bank located at 391 Forest Avenue in Portland, Maine was robbed. Nine days later, on March 18, 1995, at approximately 9:10 a.m., the People's Heritage Bank located at 605 Congress Street in Portland, Maine was robbed of $2,460 in cash, all in twenty-dollar bills. The robber was described by the bank teller as a white male, 5'10" tall, slim build, brown hair, twenty-five to thirty years of age, and wearing gray pants, a black leather jacket, and a grey, hooded sweatshirt. As part of his routine investigation of the robbery, Portland Police Detective Daniel Young contacted bus lines and taxicab companies in the Portland area to request information about any unusual fares that were received that morning. Specifically, the police inquired of the ABC Taxicab Company dispatcher whether any unusual fares had been called in from the corner of High Street and Congress Street in Portland, Maine. The dispatcher responded that no unusual fares had been called in from that location. In a subsequent interview, Special Agent Urey Patrick of the Federal Bureau of Investigation asked the ABC Taxicab dispatcher whether any out-of-town fares had been received. Agent Patrick was told that a fare was called in from 28 Waterville Street at approximately 11:00 a.m. requesting trans-

portation to Lynn, Massachusetts.[1] Detective Young knew that a man named Farrell Sutherland resided at 28 Waterville Street who matched the description of the robbery suspect and that he had an extensive criminal background. Consequently, the Portland Police Department personnel notified the New Hampshire and Massachusetts State Police about the bank robbery, relaying the eyewitness description of the robbery suspect, that the suspect had escaped with approximately $2,500 in twenty-dollar bills and providing a description of the ABC taxicab.

At approximately 12:45 p.m., the four Massachusetts State Police cars stopped the ABC taxicab as it traveled south on Interstate 95 in the area of Newbury, Massachusetts. As Trooper Haselton approached the vehicle, he saw a white male wearing a black leather jacket who generally matched the description of the bank robbery suspect. Trooper Haselton also saw a grey sweatshirt in the back seat next to the man. Trooper Haselton ordered Defendants Sutherland and Foster out of the vehicle. After being asked by the police, Foster consented to a search of her purse. In the purse, the police found approximately $2,300 in twenty-dollar bills and hypodermic syringes.

Both Sutherland and Foster were taken to the Massachusetts State Police Barracks in Newbury, Massachusetts, where they were advised of their *Miranda* rights. Detective Young and Special Agent Patrick travelled to Newbury, verified that both Sutherland and Foster had been advised of their *Miranda* rights, readvised them of their *Miranda* rights, and questioned them separately. Foster was questioned first, admitting her role in the Key Bank robbery. Govt. Ex. 2. Sutherland initially told the police that he had not left 28 Waterville Street on the morning of March 18 until the taxicab picked him up. He also claimed that friends had given him the money found in Foster's purse. However, after viewing bank surveillance photographs of the March 9 Key Bank robbery, Sutherland confessed to robbing both

---

1. The dispatcher attempted to contact the taxicab driver who had called in the Lynn, Massachusetts fare, but was unable to do so as the cab's radio had apparently been turned off. The cab driver testified that the two individuals initially requested to be taken to the Greyhound Bus station and then had decided to go to Lynn, Massachusetts.

the Key Bank and the People's Heritage Bank. He told police that the second robbery was "spontaneous" and that during the robbery, he wore the black leather coat found when he was stopped. Sutherland also said the bank teller gave him "all those twenties that were in Foster's purse." Govt. Ex. 3. Sutherland told police that, following the robbery, he went to 28 Waterville Street, where he showered, changed his pants and maybe his sneakers, and flushed bank money bands down the toilet. Govt.Ex. 3. Sutherland stated that he got approximately $400 in the robbery of the Key Bank which he spent on "booze and heroin." Govt. Ex. 3.

After statements were taken from both Defendants, the information gained was used to apply for and obtain a search warrant by a judge of the Maine District Court for the residence located at 28 Waterville Street, Portland, Maine. Govt. Ex. 4. Later that day, a search was conducted pursuant to the warrant issued. During the search, the authorities seized, among other items, a pair of grey pants, two pairs of sneakers, syringes, and approximately thirty-seven empty bags known to be the type used to store heroin. Govt. Ex. 4.

## II. DEFENDANTS' MOTIONS TO SUPPRESS

### A. The Stop of the Taxicab

▪ Defendants Sutherland and Foster contend that the stop of the taxicab was illegal. Police officers are permitted to make a limited investigative stop of a person or a vehicle if there is articulable and reasonable suspicion that the individual was engaged in criminal activity. *See United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *United States v. Kimball,* 25 F.3d 1, 6 (1st Cir.1994). The existence of reasonable suspicion is based on the totality of the circumstances which confronted the officer at the time of the stop. *See United States v. Trullo,* 809 F.2d 108, 111 (1st Cir.1987).

▪ Detective Young testified that Sutherland, matching the description of the bank robber suspect, was known to have resided at 28 Waterville Street in Portland where the ABC taxicab was called to pick up a fare less than three hours after the robbery. *See United States v. Taylor,* 985 F.2d 3, 6 (1st Cir.1993). The individuals picked up at 28 Waterville Street asked to be transported to Lynn, Massachusetts. Sutherland was known to have an extensive criminal background. As a result of this information, Detective Young notified the New Hampshire and Massachusetts State Police about the bank robbery, the eyewitness description of the robbery suspect and his clothing, that the suspect escaped with approximately $2,500 in twenty-dollar bills, and a description of the ABC taxicab. Such facts are sufficient to raise a reasonable and articulable suspicion of criminal activity and provided sufficient information to justify stopping the taxicab to investigate further whether the suspects were engaged in criminal activity. *See Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879–80, 20 L.Ed.2d 889 (1968); *Kimball,* 25 F.3d at 6.

### B. The Arrest of Defendants and the Search of the Taxicab

Sutherland also contends that the search of the taxicab and his arrest violated his Fourth Amendment right to be free from unreasonable searches and seizures. Sutherland argues that the search was illegal because the police did not have probable cause to believe the vehicle contained contraband or, in the alternative, that the police did not have probable cause to arrest Defendants. Foster also contends that her arrest was illegal. As a result of the allegedly illegal seizure, Defendants contend that the physical evidence should be suppressed. The Government argues that the search of the vehicle is justified as being incident to Sutherland and Foster's lawful arrest. *New York v. Belton,* 453 U.S. 454, 460–61, 101 S.Ct. 2860, 2864–65, 69 L.Ed.2d 768 (1981).

▪ Law enforcement officers are authorized to make warrantless arrests for felonies committed in or out of their presence. *United States v. Watson,* 423 U.S. 411, 418, 96 S.Ct. 820, 825, 46 L.Ed.2d 598 (1976). In order to make an arrest, agents must have probable cause to believe that the suspect had committed or was committing a crime.

Probable cause exists when agents develop knowledge or information of facts and circumstances sufficient to warrant a belief by a person of reasonable caution that an offense has been or is being committed by the person to be arrested.

■ After the taxicab had been stopped, Trooper Haselton of the Massachusetts State Police confirmed that the physical description of the robbery suspect, and the description of the clothing worn by the robbery suspect, matched that of the male passenger—Sutherland was wearing a black leather jacket and a grey, hooded sweatshirt was on the seat beside him. Trooper Haselton ordered the passengers out of the car. Trooper Haselton testified that Foster voluntarily consented to a search of her purse where the $2,300 in twenty-dollar bills and hypodermic syringes were found. In an affidavit filed with one of her motions to suppress, Foster states that she did not consent to the search of her purse.[2] Docket No. 29 Ex. D. Based upon the information already known by Trooper Haselton, and the information gained during the investigative stop, the Court finds that a reasonable and prudent police officer would have probable cause to believe that Sutherland committed the bank robbery. Therefore, his arrest and the search of the taxicab, incident to the arrest, were lawful.[3] The Court further finds Trooper Haselton's testimony that the search of Foster's purse was consensual to be persuasive.[4] Accordingly, the officers had probable cause to arrest Foster on state charges of possession of drug paraphernalia.

## C. Incriminating Statements

■ A defendant's statements made while subject to custodial interrogation are admissible at trial only if the defendant knowingly and voluntarily waived his constitutional rights respecting his privilege against self-incrimination. *See Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); *Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The government must prove by a preponderance of the evidence that a suspect waived his or her constitutional rights. *See Colorado v. Connelly*, 479 U.S. 157, 168, 107 S.Ct. 515, 522, 93 L.Ed.2d 473 (1986). In order to prove a valid waiver, the government must show first that the relinquishment of the defendant's rights was voluntary; and second, that the defendant had "full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 1141, 89 L.Ed.2d 410 (1986).

### 1. Sutherland

Sutherland contends that he waived his rights under *Miranda* because the police promised he would be placed in a drug rehabilitation program or methadone treatment program if he cooperated with the investigating officers. In addition, Sutherland argues that due to the serious side effects of heroin withdrawal that he was experiencing during police questioning, he was unable to provide a valid waiver of his constitutional rights. Although it appears that Sutherland relies on the voluntariness prong, this argument could be leveled on either dimension of the waiver analysis and, thus, the Court will deal with both bases.

■ The Government must prove by a preponderance of the evidence that the confession was voluntary under the totality of the circumstances. *See Sims v. Georgia*, 385 U.S. 538, 544, 87 S.Ct. 639, 643, 17 L.Ed.2d 593 (1967). First, the Court must determine whether defendant's statement was the product of coercion. *See Connelly*, 479 U.S. at

2. The Court notes that Foster did not testify at the suppression hearing.

3. The Court assumes Defendants had a reasonable expectation of privacy in the passenger compartment of the taxicab and, thus, standing to challenge the search. *See United States v. Salvucci*, 448 U.S. 83, 90–91, 100 S.Ct. 2547, 2552–53, 65 L.Ed.2d 619 (1980) (initially a criminal defendant must show that he had a reasonable expectation of privacy in the area searched and the items seized); *Rakas v. Illinois*, 439 U.S. 128, 148, 99 S.Ct. 421, 433, 58 L.Ed.2d 387 (1978). The Court further assumes that Sutherland seeks to suppress the grey, hooded sweatshirt and the overnight bag found in the back seat of the taxicab.

4. Sutherland is without standing to assert that the search of Foster's purse was non-consensual.

170, 107 S.Ct. at 523–24. If not, then the statement is voluntary. In assessing the knowing and intelligent dimension of the waiver, courts have looked to a number of factors such as the defendant's intelligence and education, *Stawicki v. Israel*, 778 F.2d 380, 382–84 (7th Cir.1985), *cert. denied*, 479 U.S. 842, 107 S.Ct. 150, 93 L.Ed.2d 91 (1986); defendant's age, *United States v. Doe*, 819 F.2d 206, 209 (9th Cir.1985); language barriers, *United States v. Abou–Saada*, 785 F.2d 1, 10 (1st Cir.), *cert. denied*, 477 U.S. 908, 106 S.Ct. 3283, 91 L.Ed.2d 572 (1986); familiarity with the criminal justice system, *McFadden v. Garraghty*, 820 F.2d 654, 661 (4th Cir. 1987); physical and mental condition, *United States v. Kiendra*, 663 F.2d 349, 351 (1st Cir.1981); and the time between admonition and confession, *Evans v. McCotter*, 790 F.2d 1232, 1238 (5th Cir), *cert. denied*, 479 U.S. 922, 107 S.Ct. 327, 93 L.Ed.2d 300 (1986).

██ Sutherland testified that he is a heroin addict with a habit of between forty and fifty bags per day. Sutherland also testified that the last time he had had heroin was approximately 7:00 a.m. on the day he was arrested, when he split a bag with Foster. Sutherland testified that he had felt sick as a result of heroin withdrawal during Detective Young's questioning. Specifically, Sutherland stated that he had been experiencing vomiting, body shakes, and muscle aches in his legs. Sutherland also testified that Detective Young stated: "You look very sick. Why don't you cooperate a little with us, maybe we can get you in a methadone clinic or hospital." As a result of this offer of help and his weakened physical condition, Sutherland testified, he made the incriminating statements to the police.

Detective Young and Special Agent Patrick began interviewing Sutherland at approximately 3:00 p.m. on March 18, and the interview lasted approximately thirty minutes. At that time, Detective Young advised Sutherland of his *Miranda* rights and, although he did not sign the "Waiver of Rights Form," he explicitly waived his rights, making incriminating statements shortly after the waiver. At the time of his arrest, Sutherland was a thirty-eight-year-old man with an extensive criminal history. Detective Young testified that when Sutherland made the incriminating statements, he did not appear to be suffering from any of the common symptoms of heroin withdrawal. Detective Young denied ever making any promises to Sutherland about care or treatment of his heroin addiction. However, Detective Young testified that Sutherland had expressed concern that later that evening he would be "coming down" from the heroin he had taken, and Young assured him that he would notify the Massachusetts police so that they were aware of his potential problem and, if necessary, they could take him to the proper facility.

Dr. Stanley Evans, a physician specializing in opiate addiction, testified at the suppression hearing. Dr. Evans testified that the intensity of heroin withdrawal is determined by the amount and duration of heroin use. The onset of withdrawal occurs somewhere around eight to twelve hours after heroin use and is characterized by anxiety and possibly a runny nose or tearing. The individual becomes increasingly more uncomfortable and may have difficulty sleeping. Between twenty-five and thirty-five hours after last use, the individual will start to develop muscle aching, bone aching, a goose flesh phenomena, nausea, and vomiting. These symptoms continue through the thirty-six-to-seventy-two hour period. The symptoms peak at about seventy-two hours, with individuals experiencing abdominal cramps, muscle aches, nausea, vomiting, and diarrhea. After about seventy-two hours, the symptoms begin to abate, with the individual able to enter into routine activities after approximately five days.

Dr. Evans testified that opiate withdrawal is very prominent, but unlike withdrawal from alcohol or other sedatives, opiate withdrawal does not cause mental impairment. Nevertheless, Dr. Evans did state that an individual severely distressed at the height of withdrawal could be impaired in his response to the discomfort he is experiencing. Dr. Evans testified that for a seasoned addict, the fear of the coming withdrawal can cause an increase in the level of stress and anxiety for the individual. Dr. Evans opined that he heard nothing in the testimony of the police

officers to indicate that either Sutherland or Foster were in even the first stage of withdrawal at the time that they were questioned.

Detective Young testified that when he interviewed Sutherland, he did not seem to be experiencing any symptoms of heroin withdrawal. Based on the testimony of Detective Young, and of Dr. Evans regarding the timing of the stages of heroin withdrawal, the Court is satisfied that Sutherland was not suffering from heroin withdrawal which caused any type of mental distress affecting his ability to think rationally when he was interviewed by Detective Young and Special Agent Patrick. Moreover, the Court concludes that if Sutherland was experiencing any symptoms of withdrawal, they did not create a level of discomfort that would have impaired, in any way, his responses to police questioning. By Sutherland's own testimony, it had been only eight hours since he had last used heroin; and Dr. Evans testified that at this point in heroin withdrawal, the expected symptoms are not severe. In addition, the Court finds that Detective Young did not make any promises designed to induce Sutherland's cooperation. The Court does not believe Sutherland's testimony regarding the alleged promises made by Detective Young, and, therefore, rejects his argument on this point. The testimony of Detective Young establishes that Sutherland voluntarily and knowingly agreed to waive his constitutional right against self-incrimination.

### 2. Foster

Foster claims that the statements she made implicating herself in the Key Bank robbery should be suppressed because the stop of the taxi was improper, she was arrested without probable cause, and her rights against self-incrimination were violated. The stop and arrest issues have already been addressed.

The grounds on which Foster maintains that her right against self-incrimination was violated are not clear from her motion and unhelpfully brief memorandum of law.[5] However, it was stipulated at the suppression hearing that Foster had been advised of her *Miranda* rights. Detective Young and Special Agent Patrick interviewed Foster for approximately twenty minutes starting at approximately 2:30 p.m. on March 18. During the interview, Foster made incriminating statements about her role in the Key Bank robbery. Detective Young testified that Foster did not appear to be suffering from any of the common symptoms of heroin withdrawal during their interview.[6] Detective Young testified that Foster told him that she used twenty to thirty bags of heroin each day and expressed concern that later that evening she would be experiencing heroin withdrawal symptoms. Young assured her that he would notify the Massachusetts police of her potential problem so that, if necessary, they could take her to the proper facility.

Detective Young testified that when he interviewed Foster, she did not seem to be experiencing any symptoms of heroin withdrawal. Based on the testimony of Detective Young and Dr. Evans regarding the timing of the stages of heroin withdrawal, the Court is satisfied that Foster was not suffering from heroin withdrawal which caused any type of mental distress affecting her ability to think rationally when she was interviewed by Detective Young and Special Agent Patrick. Moreover, the Court concludes that if Foster was experiencing any symptoms of withdrawal, they did not create a level of discomfort that would have impaired, in any way, her responses to police questioning. In addition, the Court finds that Detective Young did not make any promises designed to induce Foster's cooperation. The testimony of Detective Young establishes that Foster voluntarily and knowingly agreed to

---

**5.** The Court has reviewed the standard statement of the law upon which Defendant Foster's Motions to Suppress rest. The Court is troubled by the complete failure of Foster's counsel to include the specific factual basis for the motions. Defense counsel is discouraged from filing such stock motions in the future.

**6.** Later that evening, the paramedics were called to the state police barracks. After examining Foster, the paramedics took her to the hospital. Counsel did not inquire into the reason that Foster was taken to the hospital. Therefore, the Court assumes that it was unrelated to her involuntariness claim.

waive her constitutional right against self-incrimination.

### D. Search Warrant for 28 Waterville Street

Defendant Sutherland contends that some of the information used to support the search warrant was tainted as a result of the illegal arrest and search of Defendants and that the remaining information used to support the warrant was insufficient to establish probable cause to issue the warrant. As discussed at length above, the search and arrests were lawful. Therefore, the evidence and information obtained in the course of the search and arrest of Defendants was properly included in the police officer's affidavit seeking the search warrant.

Defendants Sutherland and Foster also argue that the warrant supporting the search and seizure of evidence at 28 Waterville Street was invalid because the affidavit attached to the request for the search warrant contained false statements or statements made with reckless disregard for the truth. Citing *Franks v. Delaware*, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), Defendants contend that the evidence seized must be suppressed. Specifically, Defendants contend that paragraph seven of the affidavit incorrectly characterizes Foster's statements as a "confession." Paragraph seven of the affidavit states as follows: "That FBI Special Agent Urey Patrick III and I went to Massachusetts on Saturday 3–18–95 where after *Miranda* warnings were given both Farrell Sutherland and Melissa Foster admitted their roles in each of two bank robberies." Govt. Ex. 4. The word "confession" does not appear in the affidavit. A review of the statement of Foster reveals that the affidavit is truthful and accurate with respect to Foster's statement. Defendants also contend that paragraph six of the affidavit states that Foster consented to a search of her purse but that the police report of the stop provides that the purse was searched for weapons. Trooper Haselton testified that Foster had consented to the search of her purse. Although the reason stated in the police report is not fully consistent with the testimony at the suppression hearing and the statement in the affidavit, the Court does not find that any inconsistency is sufficient to invalidate the inclusion of the evidence found in Foster's purse in the affidavit in support of the search warrant.

Finally, Defendants argue that paragraph nine of the affidavit, requesting permission to open a grey overnight bag found in the taxicab which Foster told police contained items belonging to both herself and Sutherland, is inconsistent with Foster's affidavit claiming that the police searched the overnight bag at the roadside. Although it is unclear from the testimony at the hearing whether the bag was searched at the roadside and whether consent was given to search the bag, the police could have searched the bag incident to the arrest. *Belton*, 453 U.S. at 460, 101 S.Ct. at 2864 (Incident to a lawful arrest, police officers may search the entire passenger compartment and any containers therein.). Therefore, there was no need for Detective Young to include the request to search the overnight bag in the application for the search warrant.

The evidence at the hearing establishes that, based on the totality of the circumstances, the state judge who issued the warrant could have formed a reasonable belief that the house at 28 Waterville Street contained evidence of the crimes. *Illinois v. Gates*, 462 U.S. 213, 238–39, 103 S.Ct. 2317, 2332–33, 76 L.Ed.2d 527 (1983). Because there was probable cause to issue the warrant, the search and seizure of the items within the scope of the warrant were proper.

Accordingly, Defendant Sutherland's Motions to Suppress and Defendant Foster's Motions to Suppress are *DENIED*.

So *ORDERED*.