MAINE SUPREME JUDICIAL COURT                    Reporter of Decisions
Decision:     2025 ME 9
Docket:       Wal-23-210
Argued:       January 9, 2024
Decided:      February 4, 2025

Panel:        STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.

STATE OF MAINE

v.

JULIO CESAR HERNANDEZ-RODRIGUEZ

LAWRENCE, J.

[¶1]  Julio Cesar Hernandez-Rodriguez appeals from a judgment of conviction for two drug offenses, entered by the trial court (Waldo County, *R. Murray, J.*) following his conditional guilty plea made after the court's denial of his motion to suppress statements he made to two Maine Drug Enforcement Agency (MDEA) agents before and after his arrest and the court's order on his motion for further findings.  He contends that the court erred in failing to suppress his statements to an MDEA agent (Agent One) because he had been "subject to unwarned custodial interrogation."  He also argues that the court erred in failing to suppress his statements to another MDEA agent (Agent Two) after his arrest because, considering his "minimal English proficiency, he was

2

unable to make an intentional, knowing, or voluntary waiver of his rights to be free of self-incrimination."

[¶2] While we reject the bulk of his arguments, we nevertheless vacate the judgment and remand for further proceedings because an answer to one inquiry should have been suppressed, and we cannot conclude with certainty whether the denial of the suppression of that answer would have affected Hernandez-Rodriguez's decision to accept a conditional plea or to go to trial.

## I. BACKGROUND

[¶3] The court found the following facts, which are supported by competent evidence from the suppression record. *See State v. Dominique*, 2008 ME 180, ¶ 10, 960 A.2d 1160.

## A.    Hernandez-Rodriguez's Statements to Agent One

[¶4] On March 15, 2022, MDEA agents, working with a confidential informant, stopped an automobile and separated and detained its occupants. While other agents searched the automobile, Agent One took Hernandez-Rodriguez into Agent One's unmarked vehicle. Hernandez-Rodriguez was handcuffed. Agent One questioned Hernandez-Rodriguez in English and Hernandez-Rodriguez answered in

English; however, "it was apparent to [Agent One] that English was not Hernandez[-Rodriguez]'s first language."

[¶5]  Agent One explained that Hernandez-Rodriguez was being detained, and Agent One tried to read Hernandez-Rodriguez his *Miranda*[1] rights, but, before Agent One finished, Hernandez-Rodriguez "indicated that he did not know what *Miranda* rights were" and "didn't understand."  Agent One quickly stopped and did not finish reading the *Miranda* rights, he asked if Hernandez-Rodriguez needed an interpreter, and Hernandez-Rodriguez responded affirmatively.  Agent One said that the agents would try to get an interpreter for Hernandez-Rodriguez.  Agent One "reiterated that he was a drug enforcement officer" and that "he and the other agents were conducting a drug investigation," and he explained that he "would just sit with" Hernandez-Rodriguez.

[¶6]  While detaining Hernandez-Rodriguez, Agent One said that he would not ask questions and that Hernandez-Rodriguez "did not have to say anything," and Hernandez-Rodriguez indicated that he understood.  Agent One provided Hernandez-Rodriguez with some water, "made small talk" about

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966).

4

"topics unrelated to the investigation," and then stopped talking to Hernandez-Rodriguez.

[¶7]    Agent One and another agent eventually searched Hernandez-Rodriguez.  During the search, the agents recovered something that Hernandez-Rodriguez had said was in his pocket and that he identified was "a line" that he used to "sniff" sometimes.  Agent One asked Hernandez-Rodriguez, "Little bit of coke?" and Hernandez-Rodriguez responded "Yeah, coke.  That's the coke."  Hernandez-Rodriguez had not identified the substance on his person as cocaine before the agent asked this question.  When Hernandez-Rodriguez was back in the car, Agent One again explained that Hernandez-Rodriguez did not have to talk to him and Hernandez-Rodriguez "indicated that he understood."

[¶8]  Hernandez-Rodriguez repeatedly initiated conversation about the investigation, and Agent One cut him off.  Agent One commented that Hernandez-Rodriguez smelled like marijuana, and Hernandez-Rodriguez volunteered that he had smoked marijuana shortly before he was detained. While watching the automobile search, Hernandez-Rodriguez "announced that agents had found drugs in the automobile."

[¶9]     Hernandez-Rodriguez asked to call his attorney. Hernandez-Rodriguez told Agent One that he did not know the numbers and would need to search in his phone. Agent One told Hernandez-Rodriguez that agents would likely need to take Hernandez-Rodriguez's phone but that the agents could show the phone to Hernandez-Rodriguez so he could get the numbers. Hernandez-Rodriguez identified his phone, Agent One brought the phone to him, and Hernandez-Rodriguez unlocked the phone and got the numbers he needed. Agent One's questions during this process were short, and he testified that their purpose was to give Hernandez-Rodriguez access to the contact information that Hernandez-Rodriguez needed.

**B.     Hernandez-Rodriguez's Statements to Agent Two**

[¶10]  After his arrest, Hernandez-Rodriguez was brought to a jail, where he was interviewed by Agent Two. Agent Two asked Hernandez-Rodriguez if he spoke English. Hernandez-Rodriguez indicated that he could speak and understand some English but not everything; however, he later acknowledged that he could read English. Hernandez-Rodriguez said that he had been arrested before and "that he understood that *Miranda* rights were very important, but that he hadn't understood the rights when he was arrested." Agent Two gave Hernandez-Rodriguez a written waiver form containing the

*Miranda* rights, and he had Hernandez-Rodriguez read the rights out loud. Agent Two asked if Hernandez-Rodriguez had understood the rights, and Hernandez-Rodriguez responded that he understood.

[¶11]  Next, Agent Two read each section of the *Miranda* rights on the written waiver form to Hernandez-Rodriguez and, upon concluding each section, asked Hernandez-Rodriguez if he understood what it meant. Hernandez-Rodriguez affirmed that he understood the section each time. Agent Two then explained that Hernandez-Rodriguez did not have to talk to him, asked Hernandez-Rodriguez several times if he still wanted to talk to him, and each time Hernandez-Rodriguez affirmatively indicated he wanted to talk to Agent Two.

[¶12]  Agent Two read and explained the paragraph on the waiver form that specified that if Hernandez-Rodriguez signed the form he would be waiving the *Miranda* rights outlined in it.  Agent Two asked Hernandez-Rodriguez if he minded signing the form, and Hernandez-Rodriguez indicated that he wanted to sign the form and then signed it. Hernandez-Rodriguez never expressed to Agent Two that he had any difficulty understanding the *Miranda* rights when Agent Two read the rights to him.

[¶13] Agent Two questioned Hernandez-Rodriguez in English for around twenty minutes. Hernandez-Rodriguez responded to every question without needing an explanation, and language difficulties did not "appear to hamper the conversation." Hernandez-Rodriguez also voluntarily explained "how he had previously spoken with an attorney in conjunction with another event and that he knew from that interaction that he did not have to speak with Agent Two," and he "repeatedly indicated that he wanted to talk to Agent Two."

[¶14] Later on in the proceedings, after Hernandez-Rodriguez was formally charged, a forensic psychologist evaluated Hernandez-Rodriguez's English language ability at two meetings and concluded that his English language skills "would have impeded his ability to understand the *Miranda* rights and waiver."

## C. Procedural History

[¶15] In March 2022, Hernandez-Rodriguez was charged by criminal complaint with one count of aggravated trafficking in scheduled drugs (Class A) (Count 1), 17-A M.R.S. § 1105-A(1)(M) (2024); one count of illegal importation of scheduled drugs (Class B) (Count 2), 17-A M.R.S. § 1118(1), (2)(A) (2024); and one count of unlawful trafficking in scheduled drugs (Class B) (Count 3),

8

17-A M.R.S. § 1103(1-A)(A) (2024). An indictment was filed with the same three counts on March 23, 2022,[2] and Hernandez-Rodriguez pleaded not guilty.

[¶16] In July 2022, Hernandez-Rodriguez filed a motion to suppress all of his statements to law enforcement, contending that he did not receive *Miranda* warnings prior to making the statements and that, given his limited English proficiency, he never knowingly and intelligently waived his *Miranda* rights.

[¶17] After a hearing on the motion, the court denied the motion by order entered on April 10, 2023. The court determined that the State did not contest that Hernandez-Rodriguez was in custody while speaking to Agent One and to Agent Two, and the State likewise does not contest that fact on appeal. The State also conceded that Hernandez-Rodriguez had not waived his *Miranda* rights while talking with Agent One. But the court agreed with the State's argument that the statements Hernandez-Rodriguez made to Agent One were admissible because they were not the product of interrogation. The court also

---

[2] The indictment alleged that Hernandez-Rodriguez had "intentionally or knowingly traffick[ed] in what he knew or believed to be a scheduled drug, which was in fact fentanyl powder"; "trafficked in fentanyl powder in a quantity of 6 grams or more"; "intentionally or knowingly" brought, carried, or transported "fentanyl and/or cocaine[] into the State from another state or country"; and "intentionally or knowingly traffick[ed] in what he knew or believed to be a scheduled drug, which was in fact cocaine."

concluded that the State had adequately rebutted the forensic psychologist's testimony regarding Hernandez-Rodriguez's English-speaking ability.

[¶18] Hernandez-Rodriguez filed a motion for further findings, which the court granted by order entered on May 5, 2023, but the court maintained its denial of Hernandez-Rodriguez's motion to suppress. Thereafter, on June 5, 2023, Hernandez-Rodriguez entered a conditional plea; he pleaded guilty to Counts 2 and 3,[3] conditioned upon his appeal of the court's orders on his motion to suppress and motion for further findings. The court entered a judgment of conviction based on Hernandez-Rodriguez's guilty plea on the same date.[4] Hernandez-Rodriguez timely appealed. *See* 15 M.R.S. § 2115 (2024); M.R. App. P. 2B(b)(1).

## II. DISCUSSION[5]

A. **Hernandez-Rodriguez's Statements to Agent One Regarding His Phone**

[¶19] After Hernandez-Rodriguez asked for access to his phone, Agent One asked questions to help identify which phone was his, and

---

[3] The State dismissed Count 1.

[4] Hernandez-Rodriguez was sentenced to three years of imprisonment on each count, to be served concurrently, and a $400 fine for each count; the fines were non-cumulative.

[5] We consider Hernandez-Rodriguez as having adequately developed only his claims under the U.S. Constitution. While he invokes article I, section 6 of the Maine Constitution along with the 5th Amendment of the United States Constitution; contends that the Maine Constitution provides

Hernandez-Rodriguez answered them.[6]  Hernandez-Rodriguez argued in the trial court, and advances to us, that his responses should have been suppressed.

[¶20]  The governing test here is set forth in *Rhode Island v. Innis*, 446 U.S. 291 (1980).  *Miranda* safeguards come into play only if the statements obtained from a person after the person has been taken into custody are "the product of interrogation."  *Id*. at 299.  Statements are the product of interrogation if the

---

broader protection of the privilege against self-incrimination; and proposes a test relying on federal law but "rooted in Maine's own constitutional concerns," in his motion to suppress he merely cited to the Maine Constitution.  Further, in his memorandum in support of his motion to suppress, although he did identify article I, section 6 and cited case law analyzing that provision of the Maine Constitution, he did so with respect to his argument about the voluntariness of his *statements* as opposed to the voluntariness of his *waiver*.  The voluntariness of a defendant's statements under the Due Process Clause is a separate issue that includes as *one* consideration whether *Miranda* warnings were recited.  *See State v. Athayde*, 2022 ME 41, ¶¶ 30, 37 & n.7, 277 A.3d 387; *cf. State v. Coombs*, 1998 ME 1, ¶¶ 7-16, 704 A.2d 387 (applying different analyses to the questions of "[w]hether a confession is voluntary" and "[w]hether a defendant has validly waived [the defendant's] *Miranda* rights").  Hernandez-Rodriguez raises on appeal no due process argument that his statements were involuntary; his claim instead is that the lack of an effective *Miranda* waiver made his statements inadmissible under *Miranda*.  With respect to that claim, we conclude that Hernandez-Rodriguez did not develop on appeal a state constitutional claim with respect to whether the lack of a warning and effective waiver of rights violates the Maine Constitution.  In his memorandum in support of his motion to suppress, Hernandez-Rodriguez did not articulate any arguments under the Maine Constitution with respect to the knowing and intelligent waiver of his *Miranda* rights, and on appeal he does not engage in an independent analysis of the Maine Constitution with respect to these determinations.  Therefore, we address his claims under only the U.S. Constitution.

[6]  Hernandez-Rodriguez cites the following colloquy:

AGENT ONE: What phone is yours? Do you know what
phone?
MR. HERNANDEZ-RODRIGUEZ: Yeah, the iPhone, the black -- the
black cover.
AGENT ONE: Okay.
HERNANDEZ-RODRIGUEZ: The iPhone 13.
AGENT ONE: Black iPhone 13?
HERNANDEZ-RODRIGUEZ: The cover is black.
AGENT ONE: Oh, the cover's black. Okay.
HERNANDEZ-RODRIGUEZ: Yeah, but the phone not black.

police engaged in express questioning or uttered "any words or actions . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id*. at 301 (footnote omitted). The test is objective. *Id*. at 302. Thus, voluntary statements not elicited in response to custodial interrogation are admissible without prior *Miranda* warnings. *Id.* at 299-302; *see also Pennsylvania v. Muniz*, 496 U.S. 582, 604 (1990).

[¶21] We review "the factual findings made by the trial court for clear error," and we review "de novo for issues of law and for the ultimate determination of whether the statement should be suppressed." *Dominique*, 2008 ME 180, ¶ 10, 960 A.2d 1160 (quotation marks omitted); *see also State v. Fleming*, 2020 ME 120, ¶ 25, 239 A.3d 648 ("A court's conclusion that a law enforcement officer's comment did not constitute interrogation will be upheld unless the evidence shows that a contrary inference was the only reasonable conclusion that could have been drawn." (quotation marks and alteration omitted)).

[¶22] The Superior Court did not err in concluding that Hernandez-Rodriguez's statements regarding his phone were not the product of custodial interrogation. Hernandez-Rodriguez started the colloquy by asking for his phone and Agent One merely responded with a cursory inquiry to

12

determine which phone was his. Hence, Hernandez-Rodriguez's statements identifying his phone were not the product of custodial interrogation. *See, e.g.*, *United States v. Taylor*, 985 F.2d 3, 8 (1st Cir. 1993) (explaining that officer's cursory response to suspect's question did not render suspect's statement the product of custodial interrogation). Therefore, the court did not err in denying the request to suppress the statements that Hernandez-Rodriguez made to Agent One regarding his cell phone.

## B.      Hernandez-Rodriguez's Statements to Agent Two

[¶23]  Hernandez-Rodriguez argues that the court erred in denying his motion to suppress his statements to Agent Two because, due to his "minimal English proficiency, he was unable to make an intentional, knowing, or voluntary waiver of his rights to be free of self-incrimination."[7] Hernandez-Rodriguez contends that he requested an interpreter and asked to talk to an attorney;[8] that Agent One had concerns about Hernandez-Rodriguez's ability to speak English; that Agent Two did not try to simplify the language of the rights; that Hernandez-Rodriguez's English skills were not sufficient for him

---

[7]    On appeal, unlike in his memorandum in support of his motion to suppress, Hernandez-Rodriguez does not argue that his statements were not voluntary; he argues only that he was unable to voluntarily waive his *Miranda* rights.

[8] Hernandez-Rodriguez does not contend that his constitutional rights were violated because he invoked his right to counsel.

to understand the *Miranda* rights explained to him in English, and this is evident, for example, because he repeated the rights "in an error-filled way"; and that the totality of the circumstances suggest that he did not voluntarily waive his rights.

[¶24]   Again focusing on federal law, *see supra* n.5, we apply federal standards to determine whether Hernandez-Rodriguez effectively waived his rights.  *Boykin v. Alabama*, 395 U.S. 238, 243 (1969) ("The question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards.").

[¶25]   The prosecution bears the burden of proof to show an effective *Miranda* waiver by a preponderance of evidence.  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).  We review a suppression court's findings for clear error, with the ultimate issue of waiver subject to independent appellate review.[9]

---

[9]  The Supreme Court announced this standard of appellate review with respect to warrantless searches in *Ornelas v. United States*, 517 U.S. 690, 691, 699 (1996).  This ruling probably extends to review of *Miranda* waivers; if so, it is unclear whether this ruling was an exercise of the Supreme Court's supervisory authority over the lower federal courts or a mandate integral to the constitutional protection and thus imposed upon state courts. *See United States v. Mills*, 122 F.3d 346, 348 (7th Cir. 1997); *Clark v. State*, 287 S.W.3d 567, 572 (Ark. 2008); *State v. Brockman*, 528 S.E.2d 661, 664-65 (S.C. 2000); Russell M. Coombs, *A Third Parallel Primrose Path: The Supreme Court's Repeated, Unexplained, and Still Growing Regulation of State Courts' Criminal Appeals*, 2005 Mich. St. L. Rev. 541, 591 (2005). In any event, we have previously articulated our standard of appellate review of *Miranda* waivers as the same as the standard announced in *Ornelas*: review of the facts for clear error, with the ultimate determination reviewed de novo. *State v. Coombs*, 1998 ME 1, ¶ 13, 704 A.2d 387.

Although the Supreme Court has not yet addressed what test should be applied to determine whether someone has adequate English language skills to waive *Miranda* rights without a translation of the rights into the suspect's native language, the lower federal courts have addressed this issue.

[¶26] "[T]he existence of limited language barriers does not necessarily preclude a finding of a knowing and intelligent waiver." *United States v. Chen De Yian*, No. 94 CR. 719 (DLC), 1995 WL 422019, at *2 (S.D.N.Y. July 18, 1995); *see United States v. Guay*, 108 F.3d 545, 549 (4th Cir. 1997). The Ninth Circuit has specified that trial courts should review the totality of the circumstances using a multi-factor test that includes "whether the defendant signed a written waiver; whether the advice of rights was in the defendant's native language; whether the defendant appeared to understand those rights; whether the defendant had the assistance of a translator; whether the defendant's rights were explained painstakingly; and whether the defendant had experience with the American criminal justice system." *United States v. Amano*, 229 F.3d 801, 804-05 (9th Cir. 2000); *see also United States v. Villa-Castaneda*, 755 F. App'x 511, 516-18 (6th Cir. 2018) (considering these factors but conducting the "waiver inquiry . . . primarily from the perspective of the police, such that where the police had no reason to believe that the defendant misunderstood

the warnings, there is no basis for invalidating the *Miranda* waiver" (quotation marks and alterations omitted)).

[¶27]  Here, there was no evidence of police coercion in Agent Two's interview with Hernandez-Rodriguez, and thus we determine that Hernandez-Rodriguez voluntarily waived his *Miranda* rights.  *See United States v. Rojas-Tapia*, 446 F.3d 1, 7 (1st Cir. 2006); *United States v. Sutherland*, 891 F. Supp. 658, 662-63 (D. Me. 1995); *United States v. Vongkaysone*, No. CR.04-43-P-S, 2004 WL 2011447, at *13 (D. Me. Sept. 9, 2004); *see also Chen De Yian*, 1995 WL 422019, at *1 ("In this case, [the defendant] does not assert that the officers who interviewed him used any form of coercion in obtaining the statements he seeks to suppress.  Thus, the voluntariness of [the defendant's] confession is not at issue.").  Additionally, considering the totality of the circumstances, including the factors outlined by the Ninth Circuit, we conclude that competent evidence supports the court's findings and that the court did not err in concluding that Hernandez-Rodriguez knowingly and intelligently waived his *Miranda* rights despite his inability to speak fluent English.  *See United States v. Le*, 377 F. Supp. 2d 245, 251-52, 257-58 (D. Me. 2005); *State v. Hopkins*, 2018 ME 100, ¶ 40, 189 A.3d 741; *Amano*, 229 F.3d at

802-05; *United States v. Hussien*, No. 18-cr-00078, 2018 WL 5046064, at *2, *4 (D. Me. Oct. 17, 2018); *Chen De Yian*, 1995 WL 422019, at *2-3.

[¶28] There are factors favoring Hernandez-Rodriguez's argument, including details from his prior interactions with Agent One. He indicated to Agent One that he did not know what his *Miranda* rights were; it was evident to Agent One that English was not Hernandez-Rodriguez's first language; and when asked whether he needed an interpreter, Hernandez-Rodriguez responded affirmatively. But the State already concedes that Hernandez-Rodriguez had not waived his *Miranda* rights during his interaction with Agent One.

[¶29] Beyond the factors resulting from his dealings with Agent One, there are two other factors that lean in Hernandez-Rodriguez's favor. First, the forensic psychologist concluded that Hernandez-Rodriguez's language capacity impeded his ability to understand his rights. Second, during his interaction with Agent Two, Hernandez-Rodriguez said that he had not understood the *Miranda* rights when he was arrested.

[¶30] However, there are also factors that support the court's conclusion that Hernandez-Rodriguez knowingly and intelligently waived his *Miranda* rights during his interaction with Agent Two. While speaking with Agent Two,

Hernandez-Rodriguez indicated that he could speak English, though he could not understand everything, and that he could read English; Hernandez-Rodriguez said that he was arrested before and understood that *Miranda* rights were important; and Hernandez-Rodriguez received a written waiver form stating his rights, which Agent Two had him read out loud. Hernandez-Rodriguez indicated that he understood the rights. Agent Two then read each section of the rights and Hernandez-Rodriguez responded affirmatively when asked after each section if he understood the section's meaning. Agent Two explained to Hernandez-Rodriguez that he did not have to talk to Agent Two, and Hernandez-Rodriguez answered affirmatively each time Agent Two asked if Hernandez-Rodriguez still wanted to talk to him. Hernandez-Rodriguez signed the written waiver form stating his rights, and he never expressed that he could not understand the rights, even though he had previously indicated that he was not clear about the rights.

[¶31]     During Agent Two's interrogation, Hernandez-Rodriguez responded to all questions without needing an explanation. *See United States v. Braiani*, No. 06-78-P-S, 2007 WL 28439, at *6 (D. Me. Jan. 2, 2007). He conveyed that he knew that he did not have to talk to Agent Two, and he repeatedly indicated that he wanted to speak with Agent Two. Finally, the court concluded

that the State's presentation of facts adequately rebutted the forensic psychologist's testimony regarding Hernandez-Rodriguez's English-language limitations. *See United States v. Reynoso*, 336 F.3d 46, 49 (1st Cir. 2003) (explaining that the district court is "the primary arbiter of witness credibility" and when it received conflicting testimony it "acted well within its prerogative in discrediting the version of the relevant events posited by [the defendant]"); *see also State v. Zurita*, 584 A.2d 758, 761-62 (N.H. 1990) ("The testimony of the defendant's expert was adequately rebutted by the consistent and apparently reliable testimony of [the] police detectives . . . and the court, as the finder of fact, was free to find the defendant's expert's testimony, the accuracy of which was questionable in any case, controverted.").

[¶32]   We thus conclude that the court did not err in concluding that Hernandez-Rodriguez validly waived his *Miranda* rights in his interaction with Agent Two.[10] *See Campaneria v. Reid*, 891 F.2d 1014, 1017, 1020 (2d Cir. 1989) (determining that a "limited" proficiency in English did not prevent a knowing

---

[10]   Although we conclude that the court did not err in determining that Hernandez-Rodriguez validly waived his *Miranda* rights, we emphasize that issues regarding limited English proficiency in this context must be approached with care. Individuals with limited English proficiency frequently present as understanding English better than they actually do. *See* Aneta Pavlenko, *Language Proficiency as a Matter of Law: Judicial Reasoning on* Miranda *Waivers by Speakers with Limited English Proficiency (LEP)*, 37 Int'l J. Semiotics L. 329, 332-33, 335, 351 (2024). As evidenced by the Ninth Circuit factors discussed above, English proficiency remains an important factor for courts' waiver analysis.

and intelligent waiver where the record demonstrated that "although [the defendant] spoke in broken English with an accent and occasionally lapsed into Spanish, his command of English was sufficient for him to have understood the *Miranda* warnings given to him" and the defendant "indicated that he understood" his rights); *United States v. Abou-Saada*, 785 F.2d 1, 10-11 (1st Cir. 1986); *Valdez v. Ward*, 219 F.3d 1222, 1227-28, 1230-31 (10th Cir. 2000) (stating that while the defendant "had some limitations in his ability to speak English and therefore occasionally referred to an interpreter to express himself at trial, he fully comprehended what was being asked of him and explained to him"); *United States v. Tellez*, 586 F. App'x 242, 243-44 (7th Cir. 2014); *United States v. Benally*, 350 F. Supp. 3d 1183, 1185-97 (D.N.M. 2018); *cf. United States v. Garibay*, 143 F.3d 534, 536, 537 & n.5, 538, 539 & n.10 (9th Cir. 1998) (concluding that "the facts surrounding [the defendant's] interrogation clearly indicate that he did not understand the nature of the rights he was waiving" where the defendant, inter alia, "had no previous experience with the criminal process," did not receive a written waiver or have his rights individually explained to him, tried to elaborate on answers using Spanish, and where the agent had to rephrase questions when the defendant did not seem to understand).

## C.    Hernandez-Rodriguez's Statement Regarding the Cocaine Found on His Person

[¶33]    We now turn to the aspect of the conversation between Hernandez-Rodriguez and the police concerning drugs found upon the search of Hernandez-Rodriguez.  Agent One asked Hernandez-Rodriguez, "Little bit of coke?" and Hernandez-Rodriguez responded "Yeah, coke.  That's the coke." Hernandez-Rodriguez had not previously identified the substance on his person as cocaine.  Moreover, as mentioned above, *see supra* ¶ 17, the State conceded that Hernandez-Rodriguez was in custody at the time and had not waived his *Miranda* rights.   The issue is whether Hernandez-Rodriguez's statement—confirming that the substance was cocaine—was the result of improper interrogation and therefore should have been suppressed.

[¶34] Agent One's question whether the substance found on Hernandez-Rodriguez was cocaine was not "small talk" or a mundane administrative inquiry;[11] the MDEA was investigating whether illegal drugs were being transported, and the MDEA agent asked Hernandez-Rodriguez whether he possessed illegal drugs.  The agent "*should have known* that the follow-up

---

[11]  The State argued: "The only time [Agent One] asked Hernandez-Rodriguez about drugs was to ask about whether he had any drugs on his person prior to an imminent search of his person.  This questioning was primarily to expedite the search and keep the searching officers safe."  We disagree that this question constituted a routine administrative inquiry.

question—regardless of how brief it may have been—would elicit an incriminating response." *Fleming*, 2020 ME 120, ¶¶ 31-33, 239 A.3d 648 (determining that the defendant's response to a corrections officer's question needed to be suppressed because the question was not a clarifying question but was meant to "expand" upon the defendant's "implausible statement");[12] *see Dominique*, 2008 ME 180, ¶ 12, 960 A.2d 1160. Thus, the court erred by not suppressing Hernandez-Rodriguez's statement in response to Agent One's question, "Little bit of coke?"

[¶35] Hernandez-Rodriguez pleaded guilty to one count of illegal importation of scheduled drugs and one count of unlawful trafficking of scheduled drugs, conditioned, inter alia, upon his appeal of the court's order on his motion to suppress. When entering a conditional guilty plea, the defendant and prosecutor must file, and the court must approve, a written certification that the case is not appropriate for application of the harmless-error doctrine.[13]

---

[12] In *Fleming*, after the discovery during a strip search of a plastic bag attached to the defendant, the defendant immediately denied that the bag was his and denied knowing how it got attached to him, at which point the corrections officer asked "whose it may be." *State v. Fleming*, 2020 ME 120, ¶ 4, 239 A.3d 648.

[13] For trial court errors that implicate a defendant's rights under the U.S. Constitution, like the suppression error here, the federal harmless-error standard applies. *Chapman v. California*, 386 U.S. 18, 20-21 (1967), *partially overruled on other grounds by Brecht v. Abrahamson*, 507 U.S. 619, 630-638 (1993). This standard requires reversal unless the reviewing court determines that the error "was harmless beyond a reasonable doubt." *Id.* at 24.

*See* M.R.U. Crim. P. 11(a)(2). That certification was entered here. Although we are not bound by the parties' certification, *see State v. Cyr*, 501 A.2d 1303, 1305 (Me. 1985) (citing *State v. Placzek*, 380 A.2d 1010, 1012 (Me. 1977))**,** we consider the parties' certification to be a compelling factor in this case given the multiple constitutional issues arising from the conflicting evidence of language-barrier concerns.

[¶36] Rule 11(a)(2), which governs conditional pleas, provides, "If the defendant prevails on appeal, the defendant shall be allowed to withdraw the plea." M.R.U. Crim. P. 11(a)(2). Given our discretion, we do not understand this language to automatically require vacatur of a judgment of conviction.[14] But this language does suggest that the circumstances are narrow in which a defendant should not be given the opportunity to withdraw his plea when he prevails in suppressing a portion of evidence on appeal.

[¶37] Discussing when, if ever, the harmless-error standard should be applied when determining whether a judgment stemming from a conditional plea should be vacated, the First Circuit reasoned that, while it was "highly

---

[14] The need to certify for appeal that a case involving a conditional plea is not appropriate for application of the harmless-error doctrine was imposed in order to "conserve prosecutorial and court resources without creating an undue burden on the appellate process." *State v. Cyr*, 501 A.2d 1303, 1305 (Me. 1985); *see* M.R. Crim. P. 11(a)(2) (repealed 2015) Advisory Committee's Note to 1987 amend., Feb. 1987, I Cluchey & Seitzinger, *Maine Criminal Practice* IV-19 (1995). It was designed to guard against frivolous appeals, not to impose any particular standard of appellate review.

unlikely" that the suppression of the statements found inadmissible "would have affected [the defendant's] decision to plead guilty . . . that is not our decision to make. . . . '[A] court has no right to decide for a defendant that his decision [to plead guilty] would have been the same had the evidence the court considers harmless not been present.'" *United States v. Molina-Gómez*, 781 F.3d 13, 25 (1st Cir. 2015) (quoting *United States v. Weber*, 668 F.2d 552, 562 (1st Cir. 1981)).

[¶38] The Court of Appeals' reasoning—that a defendant should have the opportunity to determine for himself whether the suppression of evidence affects his decision whether to accept a plea—is sound. As noted by the State, the identification of the drug on Hernandez-Rodriguez's person would likely be inevitable. Moreover, it may be doubtful whether the suppression of this one answer would have affected Hernandez-Rodriguez's choice whether to accept a plea. Nonetheless, we conclude that the appropriate course of action based upon the circumstances in this particular matter is to allow Hernandez-Rodriguez the opportunity to withdraw his plea should he choose to do so.[15]

---

[15] We do not hold that vacatur of a judgment of conviction involving a conditional plea is always required when any aspect of a motion to suppress finds favor on appeal. The Ninth Circuit has stated, "Insofar as *Molina-Gomez* may be read to mandate remand on *any* error without considering harmlessness, our precedents . . . foreclose adopting such a blanket rule." *United States v. Lustig,* 830

### III.  CONCLUSION

[¶39]  For the reasons given above, we vacate the judgment and remand for proceedings consistent with this opinion.

The entry is:

> Judgment of conviction vacated.  Remanded for further proceedings consistent with this opinion.

---

James M. Mason, Esq. (orally), Handelman & Mason LLC, Brunswick, for appellant Julio C. Hernandez-Rodriguez

Aaron M. Frey, Attorney General, and Jeffrey Baroody, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Waldo County Unified Criminal Docket docket number CR-2022-116
For Clerk Reference Only

---

F.3d 1075, 1089-90 (9th Cir. 2016) (footnote omitted).  Justice Watford, concurring in *Lustig,* would apply such a blanket rule.  *Id*. at 1092 (Watford, J., concurring).  However the harmless error test is applied in the conditional-plea context, we agree with the view of all the circuits addressing the issue that "it is only the rare case in which [the court] may definitively make the harmlessness determination necessary to preclude remand."  *Id*. at 1090 (majority opinion) (quotation marks and alteration omitted); *see also United States v. Dyer*, 54 F.4th 155, 160 (3d Cir. 2022); *United States v. Buster*, 26 F.4th 627, 635-36 (4th Cir. 2022).